FREDERICK HANSEN, Appellant, v. JAMES M. HOUGH, Appellee.

**APPEAL AND ERROR:** Review—Questions of Fact—Verdict—Conclusiveness. Evidence reviewed, and *held,* in an action to recover money received by defendant, in which plaintiff had an interest, sufficient to support the verdict for plaintiff, even though the record was strongly impressive of the improbability of defendant's having received the money at all.

**NEW TRIAL:** Discretion of Court—Inexplicable Conduct of Litigant. A new trial may be granted even though the verdict has support in the evidence, the record being impressive of the improbability of defendant's having received the money sued for, even though his conduct was inexplicable, and the court being of the impression that the defendant was laboring under serious mental deficiency.

**APPEAL AND ERROR:** Review—Estoppel to Allege Error—Inducing Submission of Issues. Inducing the court to submit special interrogatories bearing on material issues, *after the overruling of a request of the party so inducing to instruct the jury to return a verdict in his favor,* does not estop such party from claiming that the evidence was not such as to carry the issues to the jury.

**TRIAL:** Instructions—Form, Requisites and Sufficiency—Failure to Assign Reasons. An instruction briefly, concisely and peremptorily directing the jury to return a certain verdict need not include therein any reason for such action by the court.

NEW TRIAL: Discretion of Court—Estoppel of Movant to Urge Error—Effect. The court is not helpless to correct an error by granting a new trial, even though the beneficiary of the new trial is estopped, by his conduct in the trial, to urge the error.

*Appeal from Harrison District Court.*—Thomas Arthur, Judge.

THURSDAY, JUNE 29, 1916.

ACTION on a contract resulted in a verdict for plaintiff, but, on motion of defendant, the verdict was set aside and a new trial ordered. The plaintiff appeals.—*Affirmed.*

*H. L. Robertson,* for appellant.

*Cochran & Barrett* and *James C. Davis,* for appellee.

LADD, J.—The plaintiff is a machinist, as well as farmer and blacksmith. He became interested in a mail crane defendant claimed to have invented, and at defendant's request made a model of it for his use and contributed $40 toward the expenses of obtaining a patent. They entered into a contract in words following:

"Contract and conveyance of ownership between James M. Hough, of the first part, and Frederick Hansen, party of the second part, entered into this seventh day of May, 1912, witnesseth that, in consideration of valuable services rendered to me by the said Frederick Hansen, I hereby convey and transfer to the said Frederick Hansen a two-fifths interest in the patent to my mail crane, to be issued to me by the United States Government, bearing date.............1912. And further, the proceeds accruing from the sales of said crane are to be shared and shared alike; that is to say, to the said Frederick Hansen, two fifths of all moneys or revenues, and to the said James M. Hough, three fifths of all moneys or other valuables. Witness our signatures this seventh day of May, 1912. James M. Hough, Party of the first part. Frederick Hansen, Party of the second part."

The petition alleged that, about September 1, 1912,

defendant sold and transferred to the Chicago & N. W. R. Co. the right to use said crane on all lines of its railway system in carrying the United States mails, for the consideration of $6,000 duly paid, for two fifths of which, judgment was demanded, in pursuance of the terms of the above agreement. The jury allowed plaintiff the amount claimed, but its verdict was set aside by the court, and on this appeal three questions are presented: (1) Whether the evidence was sufficient to sustain the verdict; (2) whether, in sustaining the motion for new trial, the court abused its discretion; and (3) whether the record is such that these questions may be entertained.

I. Was the evidence such as to carry the issues to the jury? The plaintiff testified that defendant had informed him, about September 1, 1912, that he had sold the crane to the Chicago & N. W. R. Co. and had gotten $6,000 for it and was going to get some more; that he then arranged to retain plaintiff's share of the money for a time and stated that the company would use the crane on all its lines; that, about December 1st of the same year, he remarked, in the presence of Lockman, whom he called to witness his promise, that he had the money and was going to pay plaintiff $2,400, January 20, 1913; but, about April 1, 1913, declared that plaintiff was entitled to nothing; that he was not going to pay him a dollar; and that he would have to sue him; that he had $6,000 in the First National Bank (pointing to it) and would like to get it. Lockman corroborated plaintiff's testimony concerning the promise to pay. One Coe swore that defendant said to him that he expected "to get a sum of money out of it," and Bays, that he explained to him the mechanism of the crane at Woodbine, and said he had sold it to the Chicago & N. W. R. Co., and that, just as fast as they could be manufactured and got in readiness, they would be installed. Beebee testified that he told him he "had sold it (crane) to the Chicago & N. W. R. Co., and that they were going to adopt it on their

1. APPEAL AND ERROR: review: questions of fact: verdict: conclusiveness.

system.'' Melone related that, when leaving the courthouse, during a previous trial of the case, he walked with defendant, who, upon learning that Melone was not interested in the case, nor a juryman, remarked: ''I don't see how they can make any findings against me. They cannot find out what I did with the $6,000 for which I sold this mail crane in dispute.''

On the other hand, the defendant denied ever having made any of the above statements, and swore that he had never sold the crane to the Chicago & N. W. R. Co. and had never received money from it therefor, but, on cross-examination, explained that these matters were spoken of as a probability dependent on making a contract or disposing of the patent. At that time, he was 71 years of age, had been station agent at Woodbine 40 years and 30 days, had ceased to be such, and ''did not live at any place'' and ''was journeying around the world.''

''Q. You are just flying around? A. I am spending a little of that $6,000. Q. Are you spending it? A. Well, I am a little of it. Q. Have you got it about spent? A. No, I have the greater part of my own $6,000 and my wife's. Q. Where do you keep that? A. At the present time? Q. Yes. A. In Kentucky.''

Witness then explained that he thought counsel was talking about money of his wife's. Manifestly, the jury might well have reached the conclusion, from this evidence, that defendant had disposed of the right to use the crane and received the money therefor, as alleged. But counsel for appellee argue that the probative force of these admissions was completely overcome by other evidence tending to show that defendant never disposed of the crane, nor received any money therefor. That his patent was worthless conclusively appears, though plaintiff might have been found unaware of this. The vice-president of the company testified to having received a letter from defendant in May, 1912, expressing his surprise that the company was installing a crane at Woodbine

like one he was obtaining a patent on, and suggesting a settlement therefor, and proposing negotiations to equip therewith the entire system; that he had responded in June, following, that the crane had been in use by his company 15 years and had been invented by one of its employees; further, that he had had control of signals, mail cranes, and things of that kind, of the company since becoming vice-president, in November, 1910, and that he finally passed on all matters connected therewith; that:

"The Chicago & Northwestern Railway Company have not made any payment or made an agreement with Mr. Hough, or his representative, to pay him anything for his claimed rights under his patent for the mail crane. The Chicago & Northwestern Railway Company have not received from Mr. Hough or from anyone representing him, directly or indirectly, any authority or right to use the mail crane under his alleged patent. The attitude of the company was that Mr. Hough has no valid patent to a mail crane and that it could not make any agreement with him. . . . . No money can be paid out on transactions of the character of this one without my personal signature. I don't know of all the vouchers and checks of the company that I signed during 1912. I knew there were more letters than this one and the duplicates that I have produced between the company and Mr. Hough. I think the last letter that passed between the company and Mr. Hough was in July or August, 1912. I don't know if I have all of those letters with me. I have all of the letters that passed between the company and Mr. Hewitt about this matter. I believe I have all of them here. I am sure I have all of the letters that passed between Mr. Hough and myself about this matter. It is my recollection that I have not signed any vouchers to Mr. Hough of the character you mention on account of the crane and that a payment could not be made by the company for such an amount without my knowledge and without my signature.

That is simply a matter of recollection and research. If that amount had been paid in different sums I would have known of those vouchers. If there had been any contract entered into between Mr. Hough and the railway company since 1900, it would have to be signed by me. That is exclusively within my jurisdiction."

Re-cross-examination:

"The machinery of the company does not provide for any oral agreement such as a moral arrangement between Mr. Hough and his brother-in-law, Mr. Hewitt, with the approval of the board of directors. It would have to be reduced to a contract, and my signature would appear on it just the same. They do not have any of these side understandings to my knowledge. Q. Do you know all that is going on in the business of that corporation? A. I have to know the greater part in my particular branch of business. Q. The greater part of it? A. Yes, sir. Q. You have to know all the operating part, don't you? A. I have to go into detail of all I have to know, and I have to know everything on the railroad in respect to the corporation and in regard to the maintenance and in regard to the construction of the railroad. The traffic matters I do not profess to know or have any jurisdiction over them."

The treasurer of the company explained that the voucher system was followed in making up the records thereof; that these state the name of the party to whom the account is due, for what, and the amount, with the approval of the official interested; that the vice-president "approves the vouchers for expenditures, such as the installation of signals, mail cranes, and matters of that kind. I have made a careful research for vouchers for moneys or vouchers paid to James M. Hough, the agent at Woodbine, from the first day of January, 1910, to the present time. There have been no disbursements to him except for salary" during that time. On cross-examination, the witness explained that most of the search had been done, under his direction, by clerks, and that

his answers were based on such personal knowledge as he had, but largely on the reports of these clerks—that he relied upon such reports. The witness testified further to a personal recollection of vouchers which are unusual and out of the ordinary, that this would be such, but that he did not remember any for other than salary owed to Hough.

The cashier of the First National Bank at Woodbine swore that, during the period in question, defendant at no time exceeded $2,000 on deposit with his bank, and that was the proceeds of insurance on the life of his deceased wife. The evidence leaves no escape from the conclusion that defendant had procured a patent on a device which then was, and for 15 years had been, in use by the company, that he must have known of this for several years, and, with such knowledge, either acted with the design of extracting money from the company, or pursued the course he did through ignorance. In any event, his patent was utterly worthless, and there was no occasion for the payment of anything therefor by the company. Notwithstanding this, he may have been paid something in the purchase of peace. And this is to be inferred from the evidence that he had repeatedly asserted the receipt of money, even impliedly admitting its possession at the trial. Nor is the evidence adduced by defendant, conclusive. All that the vice-president of the company pretended to testify to was that he had no recollection of approving a voucher in favor of defendant for such a purchase, and the treasurer relied on the reports of others for the information he imparted. If the records of the company are kept as explained by these witnesses, we see no reason why it may not be ascertained absolutely whether any voucher or vouchers made out in his favor were approved between, say, July 15th and September 15th of the year 1912, and whether any check was issued to him during this time. For all these witnesses knew, this might have happened, and for this reason it cannot be said that the issue of whether defend-

ant had been paid, as he is said to have repeatedly asserted, was not for the jury to determine.

II.   Although a case was made out for the jury, the record is impressive of the improbability of defendant's having been paid anything by the railway company.  Why should it pay when it was under no obligation whatever to do so, and the official whose duty it was to determine had repudiated the claim? On the other hand, why should defendant repeatedly have asserted the receipt of the money if this were not true?  Was this done as a practical joke?  The defendant does not so claim.  He denied having made the statements.  Too many had heard him to permit of escape by this route.  The record throws doubt on defendant's credibility as a witness, and the trial court thought him afflicted with senile dementia.  No evidence bearing thereon had been adduced, and that eminent alienist must have based his opinion on defendant's conduct on the witness stand. Certainly, the evidence is not entirely convincing, either way, though one cannot escape thinking the probabilities strongly in favor of the defendant's theory of the case.  In such a situation, the trial court ought never to be criticized for granting another hearing.  There was no abuse of discretion in so doing.

2. NEW TRIAL: discretion of court: inexplicable conduct of litigant.

III.   Two special interrogations, one inquiring whether defendant had sold to the company the right to use the mail crane, and the other, whether he had received any money therefor, were submitted to the jury at the instance of the defendant.  Appellant contends that, because of presenting these, defendant was estopped from claiming that the evidence was not such as to carry the issues to the jury.  In several cases, where the sufficiency of the evidence has not been challenged prior to the submission of the case to the jury, and the motion for new trial has been overruled, we have held that a party, after inducing the

3. APPEAL AND ERROR: review: estoppel to allege error: inducing submission of issues.

court to submit an issue to the jury, cannot thereafter raise objections to the action of the court in adopting what he had proposed. *Miller v. Harrison County,* 171 Iowa 270; *Gordon v. Chicago, R. I. & P. R. Co.,* 154 Iowa 449; *Morgan v. Fremont County,* 92 Iowa 644.

But the defendant requested the court to instruct the jury "to return a verdict for defendant," and, therefore, cannot be said to have induced the court to submit the issues to the jury. It is said that this instruction

4. TRIAL: instructions: form, requisites and sufficiency: failure to assign reasons.

was defective, in that no grounds were stated therein, but the court is not required to furnish the jury with reasons for the instructions given them.

Moreover, even though a party may not be heard to insist that there is no evidence bearing on an issue, after requesting its submission, this does not preclude the court, on a motion for a new trial, from saying that, although

5. NEW TRIAL: discretion of court: estoppel of movant to urge error: effect.

there may be some evidence bearing thereon, it was not such as to have warranted a verdict such as was returned. *State v. Asbury,* 172 Iowa 606. The record was not such as to preclude a review of the questions raised.—*Affirmed.*

EVANS, C. J., GAYNOR and SALINGER, JJ., concur.