MINNIE MILLER et al., Appellees, v. CATHERINE PAULSON, Appellant.

GUARDIAN AND WARD: Former Incompetency as Bearing on
1   Present Incompetency.   On the issue whether a guardian should be appointed, the real test is incompetency *at time of trial;* but evidence of incompetency prior thereto may carry a presump-

tion of incompetency down to and at the time of trial. Evidence reviewed, and held to fully overthrow the presumption.

**INSANE PERSONS: Explaining Unequal Distribution of Property.**
2  Inferences of incompetency, arising from the fact that the one sought to be placed under guardianship had made a very unequal distribution of her property among her children, may be explained by evidence showing that the distribution was, under the circumstances, eminently fit, reasonable, and proper.

**GUARDIAN AND WARD: Defendant as a Testifying Exhibit. A**
3  jury, finding of incompetency is not necessarily conclusive on the appellate court by reason of the fact that the jury had the advantage of personally observing the alleged incompetent while she was a witness.

*Appeal from Harrison District Court.*—A. B. THORNELL, Judge.

OCTOBER 25, 1918.

REHEARING DENIED JANUARY 20, 1919.

THE appellees are the daughters of the appellant. They succeeded below in having their mother found to be of unsound mind. A motion attacking the verdict was denied. A guardian of the property of Mrs. Paulson has been appointed, and has qualified. Mrs. Paulson appeals.—*Reversed and remanded.*

*Turner & Cullison,* for appellant.

*Roadifer & Roadifer* and *H. L. Robertson,* for appellees.

SALINGER, J.—I. For testimony which discloses the conduct and mental condition of the appellant in the past, we will assume that, unless it has been overwhelmingly met,
it is sufficient to sustain the verdict. This
1. GUARDIAN AND WARD: former incompetency as bearing on present incompetency.
concession *pro arguendo* makes it needless to particularize, even if it were practicable. But to illustrate what ultimate effect said testimony of the past condition and conduct should have on this trial, we point out one item which ap-

pellees will concede is as much of an aid to their case as any-
thing that was adduced on their behalf. The item in ques-
tion is evidence that appellant conveyed large tracts of land,
perhaps all the land she had, to her two sons at much less
than its value, and offered a comparatively trifling provision
for the daughters, and, upon the rejection of this offer, gave
these daughters little, if anything. We understand it to be
claimed, and will assume it to be the fact, that this trans-
fer left appellant with much less of a provision for her main-
tenance than she might and should have had. What is the
effect of all this, and of other testimony bearing on past con-
duct? Assume, for the sake of argument, that this transfer
proves that, at the time it was made, it was proper to ap-
point a guardian for the property of the appellant: that
being assumed, the presumption of continuity establishes
*prima facie* that, at the time of the trial, the time to which
the statute confines the inquiry, she still needed such guard-
ian. But at no time was the validity of these transfers for
trial, and the mental condition when the deeds were made
is material only as prima-facie evidence that a guardian for
her property was needed at the time of the trial.

The ultimate inquiry remains, whether the allegation
that defendant is a person of unsound mind has been "sat-
isfactorily proved upon the trial." Code Section 3219.
Since the mental condition at the time of the trial is con-
trolling, were it conceded that, at that time, the defendant
was of sound mind, and capable of protecting her property
rights, it would become utterly immaterial if it were further
conceded that, at some time in the past, the defendant had
made a transfer of her property in such manner as to show
that, at that time, she was not capable of protecting her
property rights. If fully recovered at the time of the trial,
the making of such improvident deed in the past would not
justify the appointment of a guardian for her, and her past
mental incapacity would afford no remedy, except that she

herself might, after having recovered, make successful attack upon such deeds by proving her past mental incapacity. Therefore, it all resolves itself into an inquiry whether it was so strongly proved on the trial that defendant then had average mental capacity to protect her property rights, though she did not have it in the past, as that a motion for new trial, asserting failure to make satisfactory proof of incompetency, should have been sustained.

On the one side, we have testimony that tends to show lack of average mental capacity. There is testimony on the other hand disputing the first. This conflict we shall not attempt to settle. We shall first consider some matters which, on final analysis, exhibit no conflict.

### 1-a

Before going into this, it is not amiss to point out that, as is not unusual in such contests, natural affection seems to be supplanted by a malicious desire to exaggerate and color. For illustration, throughout the testimony of all of the daughters and their husbands runs an utterly unjustified assertion that the old mother was filthy in habit and unnaturally indifferent to at least the physical well-being of her little children. The "expert" testimony runs true to form. It bases an edict of insanity upon assumed things that have, in reason, no relation whatever to establishing lack of mental balance. It is the kind of testimony which, in type, gives an opinion that death ensued from a bullet wound because the deceased at one time raised Holstein cattle. The testimony given is not much less absurd. Dr. Kennedy testified, on cross-examination, that, on the assumption that the father had shown a discrimination between the children, the fact that the mother carried this out shows she is of unsound mind, and that the witness had always thought people who discriminated between children were of unsound mind.

With this digression out of the way, we turn to some

of the matters concerning which, as said, there was no substantial, if any, conflict, and which, upon analysis disprove, rather than prove, the case of the plaintiffs.

An argument of lack of business capacity is builded upon the purchase of a house in Persia. It appears that the initial negotiations were not made by the defendant, but by one of her sons; and there is a claim that she forebore at all times to make such examination and inquiry as an ordinarily prudent person would make, before purchasing. It is a sufficient answer that it fairly appears the house was in good condition; that, before finally closing, she did make reasonable investigation; and that whatsoever part her son Henry took in the matter was at her instance. It appears without dispute she asked the seller what shape it was in, and he told her it was in good shape. It all sums up merely to the claim that the son talked to the seller first, and wrote out the check in payment,—at which time, however, the defendant was present; that the buyer talked with her when she was alone, and asked her if she didn't want to go up and look at the property, and she answered she would be up there sometime to see it. He admits he had a talk with her, the day she came in to have the papers made out; and it is the undisputed testimony of Henry that the mother talked with the seller about the property on the day she bought it, and told him she wanted him to furnish her an abstract of title down to her name, move the outbuildings onto the lot and shingle them, and pay all the unpaid taxes, and that the seller agreed to do so.

Naturally enough, the appellees attach importance to the fact that the mother has endowed the two sons much more liberally than the daughters. It will be conceded, of course, that, assuming her to be mentally capable, she had a right to make even an unreasonable discrimination. It is equally manifest that the theory of the appellees is unfavorably affected if it be true that the

2. INSANE PERSONS: explaining unequal distribution of property.

differentiation was a natural one.  Of itself, it counts for
little; but it is still to be noted as a circumstance that the
son Harry is older than two of the sisters.  It appears, with-
out any dispute, that both boys worked faithfully on the
farm, without wages, until the death of their father, at
which time the son Harry was 20 years old, and the son
Henry, 22.  It is undisputed that they began working on
this farm practically when they were little children, and,
as one of them puts it, as soon as he was able to drive a
team and hold a cultivator.  This continued, as said, until
the father died.  His health was in such condition that, for
a long time prior to his death, he was incapacitated from
working.  There were lots of cattle and hogs and general
farm work; and, for all of five years before the death of
the father, the two brothers farmed all of the 250 acres that
belonged 'to the father.  They were faithful; they knew no
such thing as a vacation or going to a state fair or the like;
they had no opportunity to visit any cities, except that it
seems the two brothers were just once in Omaha and in
Council Bluffs.  Before the mother attempted any recogni-
tion of this service, the father recognized it.  It is without
dispute that, before the father died, he told the mother that
he would like to have each of the boys have a home on the
two places they had; that thereupon, the mother said, "The
boys worked hard for you, and now is a good time to give
them a home;" that he then said to the boys, "This is go-
ing to be your home,—I want you to stay right home here,
you are getting of age, and I thought I would tell you this,
so you would be working for your own interest."  Just be-
·fore he died, the father wrote the mother a letter.  It is not
stated, but is fairly to be inferred, that this letter was in
line with these previous expressions.  It appears that the
father appointed Henry executor, without bonds.  He seems
to have done nothing for the boys until he died, and at that
time, he merely noted on a slip of paper what amounted to

giving Harry a team, and he left $400 in a bank in Henry's name; but this was not known until a note left by him advised the mother of it. In this letter, no one but Harry was remembered. While the mother finally acted somewhat in line with this direction by her deceased husband, personal recognition of her own part was slight, and seems to have consisted of giving Harry a present of $5.00 when he married, and later, a top buggy and a set of harness. It is true that, of the father's estate, the girls had distributed to them $952, and that the sons got as much. And it is true also that, when the father died, all the girls except Mrs. Putman were at home, and that the daughter Marie lived at home all the time until she married, except one fall. Since her marriage, she has lived on a farm operated by her husband. The oldest daughter, Mrs. Putman, has lived in Woodbury County for many years, and was married 21 years before the trial. There is no evidence that either of the daughters are in need, nor that, though they remained at home, they did such work as it has been seen the brothers did, and thereby entitled themselves to equal financial consideration.

If she acted from resentment towards some of her daughters, it was justifiable, from her viewpoint, and at least sufficiently so as that the entertaining of the feeling is no evidence of delusion or want of mental capacity. These children tried in every way to emphasize upon the trial that the mother had always been practically a lunatic; that she was harsh and neglectful, and raised them in filth and dirt. The evidence discloses that there is no justification for either claim, and they admitted she was sane enough to become surety for some of them. It appears further that, during all the days of this trial, these daughters had nothing to do with this poor old mother on trial, and failed and neglected, if they did not absolutely refuse, to say one word of greeting or kindliness to her.

II.  But there was one piece of testimony for the defendant as to which there can be no conflict, and that was the proffer of the defendant as an exhibit to the jury, by means of her becoming a witness.  This piece of testimony merely calls upon the impartial reader to say what it does for establishing that defendant needed no guardian at the time of this trial.  In a sense, it is triable on demurrer.  Defendant's examination lasted a long time, and its abstracting fills some 40 pages of print.  The witness is old, is German, has comparatively little education, and has had very little business experience.  Yet, the ordeal to which she was thus subjected seems to us to demonstrate absolutely that, at the time of the trial, she had at least average ability to take care of her property.  Here, too, it would be utterly impracticable and without value to go into much detail.  It must suffice that we deal with ultimate deductions, based upon a most careful reading of the voluminous record, and with certain items that are outstanding.  The witness was able to give exhaustive detail of the ramifications of her family, both direct and collateral.  She was able to remember that the family sailed from Hamburg to America on the 12th of June, 1869, stopped in England on the way out, and landed in New York;  that from there they went to Davenport;  that, when she married, neither she nor her husband had any property;  that they rented a farm some 12 miles from Davenport, and "started up with farming" in Scott County;  and that the husband borrowed the money wherewith to buy the implements.  She is able to tell the long line of their gradual acquisition of property, and to describe essential conditions surrounding the acquisition and the condition of these properties.  She says they made up their minds they wanted to go west, and went to a place about three miles south of Minden, Pottawattamie County, on the Bloomer farm;  that they rented one year, and bought, right afterwards, 80 acres of prairie, which

joined the farm they were living on, and bought it from the
Rock Island railroad, and remembers they paid $12.50 an
acre; that this farm was not improved, and had neither
house nor fences; that they improved and broke it up the
same year in which they bought; that they lived on this
farm six years; and that Annie, Herman, and Marie were
born there; that, at the time of purchase, they had five
children, and no help in the house; that they had only two
cows, but raised calves right along, and kept them, and
raised hogs and chickens, she taking care of the chickens;
that she did the milking, and helped shock and stack, and
husked corn; that they fenced this 80, and put on a barn
and henhouse, with concrete, and dug a well. She continues,
that, when they sold this 80, they went to Harrison County,
and bought the 200 acres that were being "talked about in
this case." She says it was bought from L. H. Straw; that
they paid $27.50 an acre; that they got the money from the
first 80 that they had and sold; that they sold to Pete
Cadle, who now lives in town, while his children make this
80 their home; that they raised the balance by mortgage.
She states that the mortgage money was raised by mort-
gage to Clapp and Davis, at Shelby, and that they paid it
off some 12 or 13 years ago. She describes the improvements
on the 200-acre farm in full detail,—among other things,
saying that it was fenced with barbed wire, and not woven
wire. She describes the buying of another 80 from one Her-
man Alberts; says they paid $32 an acre for it; and, while
she doesn't know how long ago the purchase was made, she
knows it was bought before they got the other farm paid
for. She says the Alberts 80 was paid for "all cash," and
that Alberts has gone to Nebraska. She testifies that this
80 had a house and a little barn; that Alberts lived on it
just one winter after they bought it, they buying in the
fall, and he going to Nebraska in March; that then they
rented the land to a man named Honeyman, who lived on it

about three years; and that the house was so old that Honeyman couldn't live any more in it; and so, after he went away, they farmed it themselves.

She was able to state that her parents, during their life, had 40 acres, near Minden; that her son-in-law Putman has 160 acres, and her daughter Nancy, an 80-acre farm.

She remembers all the details connected with the marriages of her daughters, and gives the items of many small presents she made them. Speaking to the last visit she made one daughter, she says they went to Kingsley, 5 miles northwest; that it was kind of misting when they left; that her daughter objected that she might stay a few days longer, or at least another day. But she had set her mind, and wanted to go, and was all ready. And she said she had made up her mind, and that she guessed her husband wanted to go to town anyway, as it was Saturday, and he would be busy on Monday, and she didn't want to bother him. She says she didn't blame Marie's husband for bringing this lawsuit; that the girls sued her just as much as "him;" and she has the same feeling now towards them that she has against him; but she didn't have that feeling against Marie before that. When confronted with an inquiry suggesting that she was abnormally angry with her husband at times, she responded they sometimes in the family, long years ago, had what she guesses happens in every family sometimes, but that she never had had any trouble with her husband.

She is able to say that her daughter Minnie married, five years after the death of the defendant's husband, and that Minnie got her share of the property in February after the death of the husband; that Henry wound up the estate of his father, and divided the personal property by giving each of the children $950.

Speaking to a will she had made, she states that she went, herself, to have it drawn, and drove her husband's old

team.   At first, she said she named her brother-in-law to act as executor, and corrected it by saying she named nobody, because the law did that.   She states who was present when she made her will, and names the witnesses to it; says there is a clause giving to her oldest boy the 160 acres, and to the youngest the 120 acres, and that the girls should have $1,500 after her death, which the boys should pay to them after her death.

Speaking to sending one of the boys to offer each of the daughters $1,500, she goes on to say that some of the daughters "kicked."   Thereupon, she said, "nobody can have any," and that they let it alone; that they should wait until she was dead, and that there might be more money; and if there was more, that they could divide it equally when she was gone.

At one time, her husband made her a deed.   She states who the conveyancer was; that both she and her husband went to his office; that they got the descriptions from an old deed which they took along; that the deed was sent for record, and was returned to her.

She testifies that, the first year after the death of her husband, she rented the farm to the boys, and told them to improve it as they wanted to, and she would deed it over to them before she died; that they replied that this was all right, and they would take her word for it (and it appears that costly permanent improvements were put on by the sons).   When asked if it were not the fact she had never done anything about managing the lands herself, and that Henry had always managed the property in every way, she answered, "Yes," except that, during the first year after the death of her husband, she sat right there and helped them a little, and then told the son she would never do it again,—she couldn't stand it any more; that, while she felt able to do it, she couldn't talk good enough American, and that he could do it; that she lived on the farm two

years after her husband died, and the boys farmed the land the first year on her own account; that then they settled up the personal property, and she rented to the boys; that, since then, the land has been assessed in the name of the son, and he has paid the taxes.

Speaking to whether the disposition of her lands was a natural one, she testifies that, while her late husband did not say he wanted the boys to have more of the land than the girls, he did say the boys should have the land and the girls the money; that she and her husband had talked the matter over a long time, and he said the boys had had to work so hard, since their oldest boy got killed, and from the time they wore short pants; that they should have more than the girls, because he thought they had worked the hardest for the land; that she left the land to the boys because she wanted her husband's will "done like he liked to have it," and she understood, when she took the notes and made the deeds, that she was carrying out the request her husband had made before he died. When asked whether, in making her will, she was not following her own opinion and judgment, and that of no one else, she answered:

"No, sir, I was following my husband's,—he told me the boys should have more. The rest of the will was my judgment, and I thought it was right to give Henry the 160 and Harry the 120, but they to pay the cash to the girls out of that."

She is able to say that Mr. Eshelman, a banker, of Persia, drew the deeds, and that they were dated about March 10, 1914. She gives in detail when the notes for the lands were signed, and at what relative times signed by the sons and by their wives. She is able to state what rate of interest the notes draw, and that the notes were at home, and that they were not yet paid. She phrases what occurred as the beginning of a quarrel, and says the banker, Eshelman, first put the notes among her papers, but, when

this quarrel began, she took them out, and told this banker she would return them as soon as this was over. She testifies she said nothing about a mortgage, because she didn't want any mortgage.

Much is made in argument of the fact that, as a witness, she first gave an account of the transaction of conveying the lands to her sons which is much more favorable to her than her account later given. This may tend to show lack of appreciation of the sanctity of an oath; but certainly, an attempt to bolster up one's case is not evidence of want of mental capacity, or of inability to care for one's property.

There is testimony which conclusively indicates that. though the daughters and their husbands now testify that the mother was always incompetent, they did not always entertain that opinion; and that there were some occasions in the past on which these parties did not doubt the sanity and business capacity of this defendant, though they now maintain she was never of sound mind. This testimony does not merely prove this substantive impeachment of the opinion evidence, but the narration by the defendant of what occurred suggests anything rather than incapacity to understand and guard property rights. She testifies that her son-in-law Warner Doyle felt he could not buy his farm, if someone didn't sign a note with him; that he applied to his father, who told him he had some debts of his own, and was afraid he would have to pay the note, if he signed as surety, and, therefore, did not like to sign. It appears at this point, by inference, that the father finally did sign, because defendant says that Warner's mother cried all night because she was afraid that her son would not pay the note and the father would have to pay it. She testifies her daughter, the wife of Warner, appealed to her, the defendant, to sign, because they wanted to buy the 220 acres where they now are; that they talked all the time he

couldn't make the payment right up, and the daughter asked her if she wouldn't sign her note; that defendant replied, "No," she wouldn't sign it alone, if his father wouldn't go on the note; but finally, they went to the father, one evening, and defendant asked him if he wanted to go on, and said that she would if he would; that Warner's mother cried and protested; but at last, the father did sign it, and so did the defendant. She says this note was one for $2,000, and that it was given to the Avoca Bank, and she has not been obliged to pay it. She testifies that she loaned the husband of another of her daughters $950, for which he gave her a note, which is not yet paid.

Again, the witness remembers that her daughter Minnie had $950 out of the estate of the father as her share of the personal property, which was divided equally among the children; that she, the defendant, did not have this money belonging to Minnie, the first year; that, that year, it was in the bank, and she (witness) had charge of it. She testifies that she was appointed guardian by the court, and bought property with Minnie's money, paying $1,400 therefor, using Minnie's money, as far as it went, the witness putting in $450; that, on the marriage of Minnie, defendant said she guessed she would have to give her her money again, and offered the property that had been bought with the $1,400 instead, and Minnie agreed; that, thereupon, deed was made to Minnie by a named banker at Persia; that, on the marriage, she not only aided the daughter by buying comforts and sheets, but gave her the $450 which had been put in by witness in making the purchase of said property. She testifies she had had Minnie's money two years, and felt she should pay some interest; that, when she turned the property over, she told her daughter she wanted to count interest on the money for the time she had it, and that the balance of the property above interest should be Minnie's; that they didn't figure the interest, but

Minnie said she would take the property in settlement, and witness said, "All right." She continues by stating that Minnie sold the same property to Herman Moss, the mayor of Persia, whom she identifies further as "the man who was on the stand the other day."

We are not overlooking the holding of *Ferguson v. Ferguson*, 181 Iowa 1076, to the effect that the appearance of the defendant as a witness in such a case as this gives the jury an advantage in passing upon mental capacity which this court does not have, which advantage may turn the scale on review of verdict. But that advantage is very often present in cases wherein we are constrained to hold that, upon the evidence as a whole, the verdict is not supported. While the personal observation of the jury is an element of proof, it is not more than that, and the factor it is in the final decision must, in every case, depend upon the evidence as a whole. In other words, it is not the law that this court can never interfere with a verdict for being insufficiently supported by the evidence, merely because the jury saw the witnesses. It will take a stronger showing to set aside the verdict because the jury saw the witness. But it will not do to hold that no showing will be sufficient. Suppose there were one claim for incapacity, that the defendant had lost the power to correctly add three and five, and the defendant, as a witness, correctly solved a highly difficult mathematical problem. No one would say that the appellate court must find he was utterly lacking in the calculative faculty, merely because the jury saw and the appellate court did not see him when the mathematical problem was being correctly solved.

3. GUARDIAN AND WARD: defendant as a testifying exhibit.

We are constrained to hold that the motion for new trial should have been sustained, on the ground that the verdict is not supported by the evidence, and is contrary to

the evidence.    Wherefore, the cause is—*Reversed and re-manded.*

PRESTON, C. J., LADD and EVANS, JJ., concur.