CLARA WILLIAMS, Appellee, v. L. L. BUDGETT, Appellant.

**RAPE:** Civil Action—Debauchment—Insufficiency of Evidence. Evidence reviewed, and held that verdict of the jury in favor of plaintiff in an action for debauchment was not sustained by a preponderance of the evidence.

*Appeal from Lyon District Court.*—WILLIAM HUTCHINSON, Judge.

MAY 15, 1919.

THE plaintiff and appellee has verdict and judgment for damages caused by her alleged debauchment by defendant, and his alleged wrongful discharging her from his employ.—*Reversed and remanded.*

*S. D. Riniker,* for appellant.

*Simon Fisher* and *Warren H. White,* for appellee.

SALINGER, J.—I. The instructions are not challenged. They state the claim of plaintiff to be that, on or about the first day of May, 1915, and in the nighttime, defendant made an indecent assault upon the plaintiff, and that he then and there assaulted, ravished, and debauched her and carnally knew her, by force and against her will; that he repeated this offense on two other occasions; and that, as a result of the last "ravishment," she became pregnant. A further claim is that, knowing the condition of the plaintiff, defendant wrongfully and maliciously discharged her from his employment. The only complaint which requires our consideration is that the verdict is contrary to law and evidence, and is the result of passion and prejudice.

II. Plaintiff came to defendant in response to an advertisement, and began work on March 31, 1915. During

the first two or three weeks, there was a hired man.  He slept upstairs.  So did defendant and two of his three children.  Two of these were respectively 11 and 14, and a third was 8.  One of the three was a girl.  It does not appear whether she was the child of 14, 11, or of 8.  Be that as it may, during some part of April, this girl slept with plaintiff in plaintiff's room downstairs, and continued this until the hired man left.  When that occurred, the girl desired to go upstairs to sleep.  Plaintiff consented, and slept downstairs alone during part of April.  She claims that "the first day he began monkeying me;" that she did not like to sleep alone, and had the girl sleep with her, because plaintiff "was afraid of what would happen." When asked what she was afraid of, she answered that she knew very soon defendant was no gentleman; that she got very afraid of him, right away.  Being asked what she was afraid of, she answered, "Because I didn't want him monkeying in my bedroom."  Being then asked, "He had not been monkeying with you, had he?" she answered, "Yes, sir, sure he did: he came in that night."  She forgot at this point that he did not come until later.  She claims that, after he assaulted her the first time, she told him she was going to quit working for him after that; that he inquired what she was going to do, and she told him she was going to work some other place, and he then asked her to stay one night.  The assaults were repeated, and she still stayed.  Her explanation is that she didn't leave because she had no money to go, and she adds, "How can I get out?"  She also testifies that plaintiff was paying her $5 a week, the first two weeks, and $4.50 a week, another two weeks, and that she "only had $25 when I left."  Being further and definitely pressed on whether her not leaving was due to her having no money, she answered:

"Well, I had money enough; I had $25 come in, and that is all I had; he owe me one more week.  Q. Why

didn't you go away when he monkeyed with you and you were afraid of him? A. Yes, sir, I was afraid of him because I have to pull him back. Q. Why didn't you go away and get on the train and go away and leave him? A. I couldn't get no money at all to leave the first time. Q. I thought you said you had $25. A. No, that was the last time, when I got him, the 9th of July. Q. You had some money coming from him all the time? A. Well, I have money for my clothes. I needed clothes to wear. I didn't have any clothes."

But she persisted in saying, "Yes, sir, I was going to quit working for him any time if I could get money enough." Now, whatever money difficulty there may have been, it is not explained why she could not have got what money was due her as well at once after the first assault as 15 days later. At this later time, defendant did give her money wherewith to go to Spirit Lake, "and back." It was not only enough for the car fare, but enough to get two dresses for her daughter, to buy plaintiff some new rubbers, and $4.00 over, which she could spend for more clothes *when she* returned from Spirit Lake,—the place to which she went for refuge and rescue, and because "I didn't want him monkeying all the time." So far as appears, this money was furnished without any demand. And so far as appears, no demand for payment was made at the time when, after the first assault, she said she would quit, and claims she could not go for lack of money. She did not take her trunk with her. She told defendant she was going to quit him and go and visit at Spirit Lake, "and if I can get no place, then I come back again. And I told him I be back Monday morning," and arranged with him to meet her at the depot on her arrival. She kept this engagement, and he met her in accordance with it, and took her home in his car. According to her account, she made several efforts to fasten doors and win-

dows for safety, and each and all of these attempts proved insufficient. She is consistent in stating that she once more locked her door on the night after returning from Spirit Lake.

III. The plaintiff testifies that the first offense was committed on May 1st, and that she thereupon declared that she would leave. The offense was repeated. Still she did not leave. She went nowhere until the 15th of May. As before said, her explanation is that she had no money. As before said, defendant admits that he owed her. He did give her money wherewith she could and did go away on May 15th. Then she went to Spirit Lake. She claims to have written to a Mrs. Wheelock, a woman friend in Spirit Lake, to look out for a job for plaintiff; that Mrs. Wheelock answered plaintiff should come and stay a little while with her, and that she had a man for whom she thought the plaintiff could work; that, when she reached Spirit Lake, her friend wanted her to stay a little while, to which she responded, she didn't believe she could, because she was looking for a place; and that she did look for a place to work, but was unable to get one. It is the undisputed testimony of defendant that "she spoke that there was a man in Spirit Lake that met her; that they had intended to go out on a boat for a ride; that it was a little too windy, and they thought they wouldn't go. She said this man wanted her to marry him." She says she did not make any attempt to get a job, except that once she went to look for one,—"a kind of a one, but I didn't like it." She says further that Mrs. Wheelock phoned for and wrote to the man whom she had mentioned in writing to plaintiff as one for whom plaintiff could work; also, that Mrs. Wheelock did not want her to work for this man; and that Mrs. Wheelock had not written plaintiff "to come and get that job," but referred to one on another farm, whose owner plaintiff never saw at all. She

was asked why she didn't see the man that Mrs. Wheelock wrote her to come and see, and answered, "Well, I wrote to him two times or about three times. He wanted a housekeeper." Being thereupon pressed, "Why didn't you see the man Mrs. Wheelock wrote you to come down and see,—why didn't you see him, do you know?" She answered, "No, that lady was with him each time." She was then asked, "Why didn't you see this man?" She answered, "He didn't come up." Being then asked why she didn't go out and see him, she replied, "He was on a farm down there too far away, 10 miles or so." She stated further that, while on this visit, other men came to where she was, and that:

"They want me to come down and work for them at housekeeping. I didn't go down there at all. I didn't want to go. The lady told me he wasn't very good, so that I wasn't working for him. But I went down there to see if I would like it, but I didn't like it at all. One of these men lived all alone, and I didn't like it, and I won't go. I never like to work for anybody where the man is alone, and so I came back."

She seems to be speaking of the man who wanted a housekeeper. Though so sensitive about working for a man who was alone, she abandoned her attempt to escape the ravisher by obtaining work in Spirit Lake, and returned to him who, according to her account, had been very much alone in his nightly visits. As these great efforts to place herself at Spirit Lake had not found her a place, she returned to defendant in very desperation. Of course, this is somewhat weakened by the arrangement to return, made when she went to Spirit Lake. After her return from Spirit Lake, defendant made an unsuccessful attempt to break into her room. She was in fear, and slept not at all on that night. Two days later, he was suc-

cessful, and repeated his offense. Naturally, she still had escape in mind. She says:

"Well, I wait a little while to find out if I could get a job in Sioux City. I come back, thinking I stay with him a little while until I can get another place to work."

But she has the same pathetic inability to find a place from which she suffered in Spirit Lake. "I can't get it. I couldn't find it. I couldn't find any at all." Perhaps this is explained by the fact that there is no evidence whatever that she tried. On the contrary, she made arrangement for an extended stay. She obtained the consent of defendant to go to South Dakota, and bring back her little daughter. This she did because she was afraid "he would get in again," and therefore she did not wish to sleep alone. But she stayed some 20 days before she made the request. He gave her the money for this trip. She had to pass through Sioux City, but evidently forgot her desire to save herself by getting work in that city. She made no attempt to obtain it, and when she left for South Dakota, engaged to return in a few days. She brought back the little girl. She testifies, "I did not agree to work for him any length of time;" also, that she agreed to work till July 9th. Be that as it may, she stayed until July 9th.

IV. Pass these efforts to escape. We now come to her testimony as to what there was to escape from. She says:

"On the night of May 1st, he came in my room. There was nothing on the door to lock it. I did not know he was there. I was sound asleep. Q. How did you come to wake up that night? A. I was woke up that night, and I make him get off of my arm, but he wouldn't move. Q. Where was he when you woke up? A. Well, he had been on me when I had to keep kicking to push him off. Q. Where was he when you woke up,—was he on the bed or on top of you? A. He lay right on top of me, and I never

knew it. Q. What did he do on the night of the 1st of May? A. He been doing wrong with me in bed. I never knew; he was in when I was sound aleep. But he had intercourse that night."

As to the third visit, she said:

"Well, he was in that morning when I was sound asleep. I never knew he was there. He wronged me again and had intercourse. It was almost daylight, and I was sound asleep. I never knew that he got in. Q. What did you do when he was in your room there the third time? Did you lie there? A. Yes. Q. And did you do anything else,—just lie there and let him commit his act? A. At first, I put him off, but he won't move."

Speaking to the first visit, she was asked, "Well, there were two times he was on top of you before you woke up, weren't there?" She answered, "I never know; he was on me when I am sound asleep." Then the examination broadened. She was asked whether she was awake at any time when he first came in, and replied:

"Well, he wake me up all the time. Q. So you were asleep every time when he came into your room—all four times? A. Yes, sir, four times, every bit of it, I was sound asleep. Q. And before you woke up was when he got on top of you, was that it? A. I found out who it was; I felt of his right hand; it had a lump on it, and a ring on his finger. I know that is him. Q. The fourth time he was in your room, you said he was on top of you before you woke up? A. Yes; I don't know how long it been, —he just lay there."

All this rather indicates knowledge that defendant was the wrongdoer. It is interesting how she reached her knowledge of his identity.

"I didn't see at all the first night. It was too dark. I saw him the next morning, after the first time, and I

told him why he come into my bedroom, and he said he hadn't done it."

She felt of his hand and felt the lump on it, to make sure who he was. This, though the man talked and laughed, and she knew the voice, and that it was that of defendant. Being asked why she did this feeling, if she knew by the voice that the man was the defendant, she said, "Well, I remember he had a sore on his hand pretty near four weeks before it got well;" that the sore was then all healed; and that she felt the ring. Being asked whether it was dark, she answered that it was pretty near daytime.

"I seen him all right. Q. Why were you feeling of his hand, trying to find out who it was, if you could see? A. Well, that was the last thing I felt of him. The second night, I know it was him, too. It was dark. I felt him the second night, too, to find out who it was."

She was asked whether, on any other night when this man was in her bedroom, she "had to feel of him to find out who it was," and answered: "Yes, sir; I wanted to know who it was, and so I had to feel of him." Defendant testifies that he never had a sore or lump on his hand during the last summer.

### 4-a

We find this as to her resistance to "ravishment." As to her resistance on the first occasion, she testifies:

"He was too heavy. I couldn't push him off. He was pretty heavy. I couldn't push him away at all. I couldn't move away from him; he was too heavy. I couldn't push him off. I did not notice that he was in my bed. I never felt him; but just as he put his arms around me first, I woke up, and I said, 'Who are you?' and he never answered, and I said, 'Get out. I don't want you to sleep with me at all in my bed.' He said he couldn't sleep very well upstairs, and I said, 'You can sleep good,—as good as I

can;' and I kept kicking around all the time, and I told him three times, 'Please don't; get off of me;' but he didn't. He had been hurting me. I make him get off my bed, but he won't move. He wouldn't get off. I told him to get off three times. Q. Did you fight him? A. And, 'Please don't.' Q. And you told him please not to do it, three times, didn't you? A. I pushed him off once, but he got on again. Q. And you told him not to do it,—to please not do it? A. Yes, sir, I told him, 'Please don't. Go away;' but he won't move." When he was in bed on top of her, "He had his hand,—I don't know,—over my shoulder; and then I grabbed it, and put his hand away, and I see the lump on his right hand, with the ring on his finger,—but he held so that I can't get out, and I pull him away (indicating). I wanted to get out, but I couldn't get out. Q. And you say he stayed there about an hour that time? A. About that long. I don't know what time he came in bed. I don't know how long he lay there. Q. Was he laying on top of you all the time? A. Quite a while; but he pull the cover there, and I kick and push him off, and I kept a-kicking and working, and the covers were all on the floor. All I have to do is draw my legs tight as fast as I can, but he got his knee in and got my leg bent, behind. Q. He was off and on there about an hour, I take it,—is that right? A. I think that long, but I couldn't tell how long it was."

As to the fourth occasion she testifies:

"He done it to me that night. I told him to get right out,—that I didn't want him monkeying me any more; and I said, 'Please don't,' three times; and he wouldn't move, so I just kept kicking and working and pushing him off, until the covers were all over the floor. That Tuesday night after I returned from Spirit Lake, he had to lay on me without the covers, and he had his knee pushing against me so hard that it hurt me. He hurt my leg that time, and

I walked lame all summer. It hurts me yet. I went to
see a doctor in Sioux City, but he didn't see how sore my
leg was. Q. You pushed him off? A. I told him to get
off me three times, and I said, 'Please don't.' Q. He just
held you down? A. Yes, sir. He got off the first to do
the chores, and then I got up to dress, and I went out to
milk the cows, and he came into the barn to finish the
cows milking, and then he saw me crying there, and he pet
me and pushed me over on the other side, and he asked
me what I was going to do, and I told him to take it up
to the house."

On one occasion, following an alleged assault, she
cried, and he asked her what was the matter. She was
then asked, "He just kept coming just the same, and paid
no attention your crying?" and she answered:

"Well, I cried like everything on the way from the
house to the barn. Q. What did you do, if anything?
A. I had been crying that morning,—crying after he got
off; and he said, 'What is the matter? What are you cry-
ing about?' and I told him I did not want him to come in-
to my bedroom at all. Q. Now, when he was in there,
what did you do, if anything? A. Well, I went out to the
barn and milked the cows, the same morning."

She also says:

"He never asked me what I was crying about. He
never said a word. He was kind of afraid I was going to
quit him. He never asked me any questions about it. I
wouldn't speak to him. Q. What did he say to you, if any-
thing? A. He never said anything to me, but I wouldn't
speak to him at that time. Q. Did he hold you and force
you to have intercourse with him? A. Well, I couldn't
get out when he hold me tight. Q. Did you cry out or
shout or call for help? A. No, I hollered to make him get
off; three times I said, 'Please don't,' but he won't move.
Q. Did you holler three times every time that he came in

your room? A. Yes, sir, every time he would come into my room. Q. You are sure of that, are you? A. Yes, sir. Q. Now, tell the jury just how loud you would holler. A. Well, I would if I can, but I was pretty tired out to holler; did not holler help or murder, but I hollered at him to get off my bed. Q. 'Get out! Get out!' three times? A. Yes, sir. Q. You knew defendant's boy 14 years old was in the house,—why didn't you scream for him? A. No, he had two boys and one girl. Q. And why didn't you call out to this big boy? A. No, I didn't call out. I thought maybe he can't hear well. He was sound asleep. Q. You were afraid he couldn't hear, or were you afraid he could hear, —which one? A. Well, I hollered anyway, but he couldn't hear, because he was sound asleep."

The employment began March 31st. About the middle of April, and while the plaintiff and the defendant were papering a front room downstairs, defendant put his hand on her shoulder and on her leg. She told him to "quit, and let me alone," and he did so. He inquired if she was mad, and she said, "No," but that she "would get mad some day" if he didn't let her alone. Another account is that, when he came in to help her paper, he grabbed her, put his hand over her shoulder, and felt of her leg there; and she told him to get right out,—go and let her alone; and he asked her, "Are you mad?" and she told him: "No, I would some day, if he would get after me again. He didn't say anything further, but he didn't bother me daytimes after that, but at night he would act worse."

She was asked: "Now the first time he came in your bedroom, you told him you didn't have a divorce?" She answered:

"There was nothing on the door, the first night he came in. Q. Which time was it when he came into your room that you told him you didn't have a divorce,—the first or second or third or fourth time? A. The second

time. Q. And that is the objection you made at that time, was it; that you didn't have a divorce? A. I told him I didn't have no divorce, but he told me not to let anyone know about it. I told him to get right out. I didn't want him in my bed."

This appears on her resentment of her "ravishment:" When she felt of him, she told him "to get out," and "he wouldn't move." After the second incident, and the next morning thereafter, she shut the door, and told him:

"That is the last time. I am going to keep that door locked every night. And he said he would break it down; then I said, 'All right, I am going to quit working for you;' and then he asked me what I was going to do. I answered that I was going to work some other place, and he said nothing. Q. What did you do when he tried to have intercourse with you? A. He did it on me in the morning. Q. What did you do? A. Well, I told him to get out. I didn't want him monkeying me at all. I didn't want him because I didn't have no divorce at all."

Her resentment was speedy and sharp.

"I told him the next morning, I said I am going to quit his place for him if he don't keep out of my bedroom. Q. The next morning after the fourth incident, you told him he was in your room, and he denied it? A. I told him the next morning,—when I told him how he locked the door, and he said, 'Yes, darn you, you are too tight;' and I told him I didn't care."

She makes claim that defendant plugged up some holes in the door jamb, and thus prevented her using these holes for inserting a fastening. She resented this when he came into her room on one day, by saying to him, "You old fool, what makes you drive that stick into the door?"

Her history is that she married a second husband in 1913; lived with him eighteen months; that he would not support her, and spent money in gambling and drinking,

and about a year before she went to defendant, ran away
from her with another woman. She testified she had left
this husband four times while living with him, and sold
his furniture twice. She was divorced from her first hus-
band, and had two children by him. One of these is with
a sister, and the other is a little girl, the one whom she
finally brought to her as a precautionary measure after
the various offenses of the defendant, and with his consent.

### 5-a

Her testimony is evasive and incoherent. The follow-
ing must suffice for illustration by type: It became ma-
terial whether or not plaintiff had requested her sister to
forward her an extra trunk, and this occurred:

"Q. And you sent for an extra trunk to Homer, Ne-
braska, and have a trunk sent by your sister to you with
all the little girl's clothing? A. My oldest girl stayed
with my sister. Q. Didn't you go to Bridgewater, South
Dakota, on the 17th of June? A. Yes. Q. And didn't you
send to Homer, Nebraska, to your sister for a second
trunk containing the little girl's clothing, and have that
sent to you also? A. I didn't stay very long, only two
days, when I got back the 9th of June to the same place.
Q. Didn't you send to your sister's home in Nebraska for
this trunk? A. I sent for my trunk. Q. And it came,
didn't it? A. Yes, sir. Q. And you got the little girl from
Bridgewater? A. Yes, sir. Q. And all this happened
along about the last week in June? A. Well, I don't
know; I had my other trunk from her home that 5th of
June when I fetched my girl over, and I got two trunks.
I had two trunks on the train."

On another point, this occurred:

"Q. In this letter you wrote to your sister for this
second trunk, didn't you tell your sister that you liked
the place, and thought it was the best place you had ever
had? A. Well, I have staying with her over four or five

months.   Q. Didn't you write a letter, when you were
staying at defendant's, to your sister in Homer, Nebraska,
where you told her to send you another trunk?   A. Yes, I
had her send me my trunk.   Q. You wrote your sister that
letter?   A. Yes, sir, I had her send my trunk.   Q. And
didn't you write to your sister you intended to stay there
all fall and winter; it was the best place you had ever
had?   A. He claimed he wanted me all the time.   Q. Well,
didn't you write that?   Didn't you write to your sister
that it was a good place?   A. He claimed he wanted me
to stay with him, and I liked it all right, but I didn't
want him to come in my bedroom.   Q. Didn't you write
to your sister it was the best place you ever were at, and
you were going to stay and have your little girl go to
school in the fall,—didn't you write that to your sister?
A. Well, I planned to put her in school in the fall only if
he kept out of my bedroom, and if he didn't, I wouldn't
stay long.   Q. You understand my question, don't you?
I am asking you what you wrote your sister,—you under-
stand that, don't you?   Don't you understand me?   A. Yes,
sir."

Appellee says counsel further claims plaintiff told "a
disconnected, self-contradictory story about her alleged
poverty and assault," and avoids such contention in the
following statement:

"We submit that plaintiff's testimony was sufficiently
well connected and uncontradicted as to convince twelve
fair-minded, unprejudiced men that she was telling the
truth in the matter, which shows conclusively that the ver-
dict was supported by sufficient evidence to warrant its
finding."

Paraphrased, this asserts that, when complaint is
made on appeal that the evidence is of such a nature as
that the verdict is unwarranted, a sufficient answer to such
an attack upon a verdict is made by the fact that the ver-

dict was rendered. That position quite eliminates all appellate consideration of an assignment that a verdict lacks sufficient support. The existence of the verdict would preclude inquiry into whether it should exist. Appellee, in effect, urges that appellate review of a verdict must be the declaration that whatever is, is right. We think review may go beyond that. See *Miller v. Paulson*, 185 Iowa 218. Nor do we find persuasive the argument that the verdict is but a paltry sum, and that cases hold that certain amounts are not so excessive as to evince passion and prejudice. That an award is not too large if there be a right to recover at all, does not help if it must be found that no award is justified by the evidence.

VI. The last act occurred on May 19th. The trial occurred in December. Dr. Cress, to whom the plaintiff went, and who told her to return, because no diagnosis could then be made, was not made a witness. Dr. Crowley, the only medical witness, states that the first time he ever saw plaintiff "was six weeks ago." At that time, he did not find her condition pronounced enough to go beyond saying that her ailment at this time was enlarged veins on one of her limbs, and that this "was probably due to pregnancy;" that pregnancy would cause those enlarged veins. As said, when plaintiff saw Dr. Cress, he was not able to diagnose her case, until more time elapsed. Six weeks before the trial, Dr. Crowley found no pronounced condition,—all of which would tend to show that pregnancy occurred too late to serve the purpose of the plaintiff's case. There is no testimony tending to fix the time of conception, except that, in a way, it is fixed by the arguments of counsel on the respective sides. Counsel for appellant says:

"Plaintiff, on her uncontradicted testimony, was about eight months along in pregnancy at the time of the trial, and her very appearance was enough to impress the jury that the responsibility for her pregnant condition should be

laid to someone. Her condition eight months advanced made her a subject of sympathy, and it was only necessary for plaintiff to point an accusing finger, to have the jury find against defendant."

Appellee responds that appellant complains plaintiff was eight months along in pregnancy as a basis for claiming that the trial was put on at a time so that it would come on while plaintiff's appearance "presented the most pitiable object possible." And thereupon proceeds to show that the time of trial was brought about because defendant had the case continued over one term. The best that can be done is that, according to Dr. Crowley, the impregnation must have occurred too late for plaintiff's case, and that, according to plaintiff's appearance at the trial, it must have occurred too early to serve her. And this significant bit of testimony is worth noting:

"Q. Did you ever have any sexual intercourse with any other man excepting your husband? A. No, sir. Q. And Mr. Budgett? A. Yes, sir. Q. Mr. Budgett is the only man. A. Yes, sir, he is the only single man."

There was substantial neighborhood testimony giving the defendant a good reputation.

In our opinion, the jury had no warrant for finding, on this evidence, that plaintiff had established her claim by a preponderance. It follows, the cause must be—*Reversed and remanded.*

LADD, C. J., PRESTON and STEVENS, JJ., concur.