STATE OF IOWA ex rel. LILA McKEEVER, Appellee, v. THOMAS E. CAREY, Appellant.

**BASTARDS:** Evidence—Sufficiency. Evidence held sufficient to sustain a verdict of guilty, in bastardy proceedings.

> SALINGER, J., dissents.

**BASTARDS:** Proof of Intercourse. The fact of sexual intercourse may be established by the uncorroborated testimony of the prosecutrix.

**BASTARDS:** Instructions—Presumption of Innocence. It is not necessary to instruct, in bastardy proceedings, that defendant is presumed to be innocent.

**BASTARDS:** Instructions in re Alibi. Instructions reviewed, and held to properly confine the jury to a consideration of the one act of intercourse testified to by prosecutrix, and to justify the refusal of an inferential instruction on alibi.

> SALINGER, J., dissents.

**TRIAL:** Assumption of Fact. An assumption by the court of the truth of an undisputed fact is proper.

**NEW TRIAL:** Excessive Verdict. Verdict for $2,250 in bastardy proceedings held nonexcessive.

*Appeal from Cass District Court—O. D.* Wheeler, *Judge.*

MAY 11, 1920.

On December 19, 1917, the relator filed a complaint against the defendant, charging him with being the father of her illegitimate child. Trial to a jury. Defendant was found guilty, and judgment entered against him, from which he appeals.—*Affirmed.*

*Tinley, Mitchell, Pryor & Ross, H. M. Boerman,* and *C. B. Clovis,* for appellant.

*B. A. Goodspeed* and *Thomas Whitmore,* for appellee.

Preston, J.—The complaint charges that, on October 29, 1915, defendant had sexual intercourse with relator, and, as a result thereof, she became pregnant, and that, thereafter, and on July 26, 1916, and within the period of gestation, a male child was born to her. Judgment was asked to provide a fund, out of which to support said child. For answer, defendant denied that, on said date, or at any time, he had sexual intercourse with relator; denies that he is the father of the child.

1. BASTARDS: evidence: sufficiency.

1. Appellant challenges the sufficiency of the evidence to sustain the verdict. In 1912, plaintiff came to Cass County, Iowa, from Illinois, with her unmarried brother, 46 years of age. She kept house for her brother, on the farm where they were living at the time of the alleged transaction. On the date in question, relator was 36 years of age. Their residence was a quarter of a mile south of defendant's home. In 1912, defendant's wife and young boy called on relator and her brother, and relator returned the call. Relator testifies that thereafter, at the suggestion of Mrs. Carey, she took her washing to Carey's house, and they did their washing together, because Mrs. Carey had a

washing outfit, and relator had been doing her washing
by hand; that they washed that way for a year and a half
or two years, and plaintiff did some work for Mrs. Carey.
She says it was without pay, but that Mrs. Carey gave
her presents and things like that at different times, and
defendant and relator's brother exchanged work.    Until
a few months before the date of the alleged intercourse,
the relator's relations with the Careys seemed to be pleasant.
Relator says that she saw that Mrs. Carey didn't want
her, and didn't call her up on the phone, when she got
ready to wash.    Plaintiff testifies that she was a member
of the Presbyterian Church, and was active in the work
of the Ladies' Guild, and the Church Club known as the
Orphans' Home Sewing Society; that the Careys went to the
Guild.    Defendant testifies, "I hain't got no church."    Re-
lator testifies that Mrs. Carey frequently asked her to the
Carey home.    At one time, Mrs. Carey being under the care
of a physician at Atlantic, relator and her brother stayed
at the Carey home for some time, she doing the cooking
for the Carey family, which consisted of defendant and
his two sons, one a young boy, and the other a man grown.
Some time before the alleged intercourse, there was some
trouble between plaintiff and Mrs. Carey.    Relator testi-
fies that Mrs. Carey accused her of coming to defendant's
home to see her men, which relator emphatically denied,
and offered to call the men before Mrs. Carey to prove
that she had always been ladylike.    She says the matter
was dropped, and that they parted on friendly terms, but
that she saw Mrs. Carey did not want her to come there.
Mrs. Carey testifies, as to this, that she told relator not to
come, and says she did not think relator was a nice woman,
because of certain things she claims plaintiff said to her.
Mrs. Carey testifies that relator told her that she had had
sexual intercourse with different men, and with her brother,
and that certain ones had attempted to rape her; says Miss

McKeever told her she was in a tub, bathing, and her brother came in there, and they had intercourse, and witness said, "I never would tell it if I did;" that she didn·t say where it was; that there was no bath tub down there; that she said she was in a tub; that she didn't say bath tub. She says she told her husband. She says relator told her she was jealous, and that relator said she said she could take Mrs. Carey's husband from her, and break up her home. These matters are denied by relator. On cross-examination, defendant, when asked what his wife had told him, did not mention the alleged sexual intercourse with others or with her brother. He testifies that his wife told him that the Lunn boy came up there, and talked to her in the house, and that relator got up and went out and got a club and stood him off; that she didn't say he succeeded; and that one Baker, a man 60 years of age, came there and got hold of her and tore her dress nearly off; that, when his wife told him this, he said that, if that was the case, they had better cut them out, "for fear it might affect our reputation." They met occasionally thereafter, and defendant and the brother exchanged work, to some extent, but not so much as formerly. Plaintiff testifies that defendant always treated her right, until the time in question; that she thought of him as a father, and never thought of him as anything else than Mrs. Carey's husband; and that she never did anything to encourage Mr. Carey to offend her. She says that, shortly after they moved there, defendant at first called her "Cyclone Bill," and then shortened it up to just "Bill," because defendant's youngest son took her photograph when the wind was blowing, and defendant said that it was a cute picture, and put him in mind of a cyclone, and thereafter called her "Bill." Relator testifies that, on the morning of October 29th, she got up about 5 or 5:30, and describes what she did; that her

brother left for the day around 8 o'clock; that, after her
brother had gone out to hitch up, she saw defendant pass-
ing, going south, riding a black stallion; that, after that,
she did up her morning work, and was sewing; that, some-
where around 10 or half past 10 that morning,—she could
not say exactly, but her best judgment is, about 10:15,—
defendant came to the house, and came in the room where
she was alone, without knocking; that, after he came in
the room, he had a kind of funny grin on his face, and she
doesn't remember what he said first; that he came around
the sewing machine and reached out and took hold of her;
that she asked what he meant; that he put his arms around
her and took her across the room to the couch and pushed
her down on his lap; and, while she was on his lap, with
his right hand removed her underclothes, and held her arms
down firmly, with his arm around her; that he then laid
her down on the floor, and had sexual intercourse with her.
She says she didn't do anything much by way of resistance,
only cry and beg; that she was too scared and dumb-
founded; that he said, "Bill, don't fight me so;" that after-
wards he told her there would not be a bit of danger, "didn't
need to be afraid, no one will never know;" that she was
still crying and protesting; that, after the intercourse, she
rolled over on her face and was crying, and he picked
her up and set her down on his lap for five or ten minutes;
that she was crying too much to know or care what he
did or what happened to her; that she asked him if she had
ever done anything down at his house to make him think
she was that kind of a girl, and he said, "No;" and when
she asked him why he treated her that way, he said her
legs were enough to set any man crazy; that she doesn't
imagine defendant was in there more than 25 or 30 min-
utes; that she doesn't know just how long; that she didn't
see him come there; that he walked away through the field
in a roundabout way through the corn field; that he could

have got off the stubble field, without going through the corn; that he did not take the nearest way home; that he could have gone on the road; that she doesn't know what time it was when he left, but that it was between half-past ten and eleven, somewhere,—she couldn't say. She says her mind wasn't on the clock. She fixed the date because it was the day after McFarland's sale, which was on the 28th. She says that it is pretty hard to erase it from her mind, and is sure that is the date. She testifies that she hadn't kept company with men, gone out riding, and attended functions, for a month prior to the 29th; that she did not keep company with any men during the fall of 1915; that she never had intercourse with any other man. She testifies more in detail than we have stated, and says further that, on February 29th, defendant came to their place, to help her brother Henry; that defendant came to the house, and she told him of her condition, and asked him what she was going to do; that defendant said, "I am sure I don't know,—I know damned well what I done;" that he said he didn't think there was anyone else; that she had seen him before that at a threshers' supper, but in a crowd, and had no opportunity to speak to him; that after that she saw him at another threshing supper, but only passed the time of day; that she told her brother of her condition, May 16th; that the child was born at her house. She says the child is the child of defendant. On cross-examination, she testifies that, at one time, it was raining, and the roof was leaking on new wall paper, and that she and defendant went into the attic with pans, to catch the water; that she told Mrs. Carey of this over the phone, when Mrs. Carey was in Atlantic, and told her the circumstances; that Mrs. Carey accused her, and said that she and Tom were up in the attic; that she had washed that day at defendant's; that the last man that had worked for her brother was in August; that she is not mistaken about the date's being the

29th, because, when a person receives a shock, "they are not likely to forget it;" that defendant never had intercourse with her except that time; that her brother hauled cement blocks that day for Mr. Kirk; that her underclothes were not torn, and that she put them on again, after defendant left.

Henry McKeever, relator's brother, says that, after breakfast, he went out and hitched up his team; that he saw defendant between 8 and half past 8 that morning, riding a black stallion; that defendant was then 10 rods from the house; that it was a clear day. He fixes the date as the day after the McFarland sale, and, at the sale, Kirk asked him to haul blocks the next day. He says the sale was on October 28th, and that defendant came home with him from the sale; that they walked together; that several of the neighbors hauled blocks that day. He describes their relations with the Careys, exchanging work, visiting, etc., and says he traded horses with him on February 29, 1916. He testifies about Carey's going to the house for soap and water that day, when they were doctoring a colt; that, on May 24, 1916, after his sister had told him of her condition, on the 16th, he saw defendant in front of his place; that three other men were present; that witness asked defendant if he hadn't always used him white, and defendant said, "Yes;" that witness then asked him, "What made you use Lila the way you did, last October?" He answered that he never said a word against her in his life; and witness said, "It was not what you said,—it was what you done." Witness testifies that defendant then said, "I never done anything;" that defendant's jaws trembled so he could hardly talk, part of the time; that, prior to the fall of 1915, defendant had always been jovial, and defendant would wave at witness from a distance, but, the next spring, defendant did not look towards him, or notice him when they were close together. Witness Runte

testifies that he lived half a mile south of defendant's place; was at the sale, October 28th, saw the bills, and saw defendant there; the next day, he went to haul blocks at Atlantic; left home about 8 A. M.; saw defendant, the morning of the 29th; went by witness's place, before he left home; defendant was going from his home towards Hannah's, riding a black stallion; was within 15 rods of him; knows defendant well, and knows his horse; is positive he saw him; didn't know where he was going at the time, but learned afterwards; defendant spoke to witness, and says, "Hello, Stormer."

"That is my name. I live a little over a quarter of a mile from McKeever's. Was with Henry McKeever, May 24th, in the road in front of defendant's house. It was at that time that defendant said he hadn't said anything against Miss McKeever. Defendant acted like he was badly scared."

Mr. Hannah says he lived, in October, 1915, half a mile south and 40 or 50 rods east of defendant's; defendant was at his place with a black stallion; bred a mare for witness; it was near 8 o'clock; defendant stayed at his place about a quarter of an hour; doesn't know which way he went when he left. He fixes the time that defendant was at his place on October 29, 1915, because it was the day after McFarland's sale, and, on the 29th, he hauled cement blocks for Kirk. He is positive about the date.

Mr. Kirk testifies as to several of the neighbors' hauling cement blocks for him on October 29, 1915. He fixes the date because he has his bills in his pocket; knows Mr. Hannah; lived half a mile east from where he lived; saw defendant, the morning of October 29th, at Hannah's place. He says it was around 8 o'clock; that defendant had his horse with him; that he is acquainted with the horse, a black stallion. He is positive defendant was there with the stallion;

knows of no other man in that neighborhood who has a black stallion.

Witness Engle testifies to a conversation with defendant with reference to relator, about April, a year before the trial, which would be 1917; that he asked defendant about it, and that defendant at first denied it.

"He said it wasn't his child at all; he said it was her brother's. Q. State what he said. A. Well, I believe he said he did have intercourse with her once."

The witness put it stronger than that at first; but, the way the answer was framed, it was struck out as a conclusion. His testimony was somewhat weakened on cross-examination, and by answers given by him at a former trial. This is the substance of the State's testimony.

The defendant, testifying as a witness, in addition to what we have before set out, describes the relations between the McKeevers and the Careys. He says he remembers the time Kirk was having cement blocks hauled,—it was October 29th; remembers it on account of the sale, which was on the 28th; was not away from home that morning; did not take the stallion and go away from the place, October 29th; the last mare he bred was Hannah's; had a black stallion; thinks the last he ever bred was October 13th,— Hannah's; kept a stud book; could not find it.

"Looked for it last night, so I could get a date. The date I wanted was the date I was over at Hannah's, the last time. Don't know what became of the book; it was there when we packed up to move. Q. Did your book show any service of your horse on the 29th? A. Yes, sir. Q. Whose? A. I take that back; I thought you said the 13th. Q. No, sir, I am speaking of the 29th. A. No, it does not show any service on the 29th; the 13th was the last time. The horse may have been off the premises after the 13th; I would sometimes ride him to the neighbors'."

He testifies of his doings that morning and forenoon;

did his chores; took a wheelbarrow and went to the field for a young calf. He says that, when he got back with the calf:

"I suppose that would be about 8 o'clock; as to how long it took, I am guessing at it. I don't know how long it took. When I got back with the calf, there was nobody in the yard,—my two sons had gone."

He says he then went to the house and got a drink of water, then went out to peeling poles for a hen roost, about 8 o'clock, about 60 feet from the house. Mrs. Carey and Miss Thompson were about the place, in the house.

"Miss Thompson came down there, when I came with the calf; was peeling poles, when Elliott and Blake came, and that was around 10 o'clock. I could tell you what time it was from noon when they arrived,—a man can tell pretty close. It was a nice, sunshiny day. I guessed at it; I didn't notice the clock; I couldn't tell exactly. We talked business. It was right around 10 o'clock when they came,— I am not positive just to the minute. They stayed for dinner. Had an early dinner, about a quarter of 12. I told my wife to have an early dinner for them. We were at dinner half an hour. The men left after dinner. I came to Atlantic."

Witness denies having intercourse with Miss McKeever on October 29th; denies that he was at her house; says he never had intercourse with her at any time in his life; says the McFarland sale was on October 28th.

"I saw the bills, and was at the sale. I know the cement blocks were hauled for Kirk the next day; there is no question about that. Was at McKeever's in February; had no talk with Miss McKeever, only told her I wanted some warm water, and she said, 'All right,' and went to the reservoir and got it."

Harvey Carey, son of defendant, 29 years old, says:

"The highway past our house runs north and south. We are on the east side of the road. McKeevers lived south.

I hauled blocks the 29th. I think I got to Atlantic about 11 o'clock. Left home around 8 o'clock. I am judging from the time we usually got up and done the chores and got around, also by the time I got to Atlantic. I got up about 5 or 5:30 that morning; had chores to do. Think we had breakfast about 6 or 6:30. Met Blake and Elliott on the road between our place and Atlantic, three or four miles from home. I would not be positive it was 10 o'clock; I don't hardly think it was that late; didn't look at a watch. I couldn't say how long it would take to drive the distance I had. I would say an hour and a quarter, to drive the team from home to where I met them. Think it would be a little after 9 o'clock when I met them. Couldn't say positively when we got to Atlantic,—might have been about 11 o'clock. Nine and three-quarters miles from our place to Atlantic. I don't know that Miss McKeever ever attempted to make love to me."

Blake says:

"Live in Atlantic. Was at Carey's the latter part of October,—can't say the 29th. Went in Elliott's car. Met Harvey Carey on the road. Arrived at Carey's home a little after 10 o'clock; found Carey in the yard peeling poles. Think they had dinner a little early, before 12. Carey did not leave the premises before dinner, after we arrived. Was with him all the time."

Elliott, a brother of Mrs. Carey's, testifies about the same as Blake. He says they arrived at defendant's place about 10 o'clock; "may have been a little before or a little after 10. 'I didn't look at my watch any time I was there. Don't know what speed we drove."

Miss Thompson says she was staying at Carey's; that she knows Blake and Elliott; that they were there the day the blocks were hauled; that they arrived at Carey's, "I should judge around 10 o'clock, somewhere at that time;" that she was ironing that morning; that she could see the

men talking at the pole pile; that she got up that morning about daylight.

"We usually got up at that time. Don't know when we had breakfast,—perhaps half an hour after we got up,—don't remember the hour exactly,—perhaps longer. Went down and closed the gate when defendant brought the calf up. After the calf trouble, saw Carey after that; couldn't say just as to the time. Came back to the house and went to ironing. When I looked out the window, soon after that, noticed him peeling poles. Couldn't say just what time it was. Didn't miss defendant from the place that morning. The son Harvey left around 8 o'clock. It was early in the morning. I do not fix the time at exactly 8 o'clock,—as near as I can remember, it was around 8."

She doesn't think she remembers all she did that morning. She says she usually made up the beds and helped do the morning work, and such things; that defendant started to peel the poles, after taking care of the calf, couldn't say the time.

"Don't think it was as late as 9 o'clock when he began peeling poles. Don't know whether he went right away to peeling poles after taking care of the calf or not. Didn't see him go there, but the first I noticed, he was peeling poles. Would not say I saw him all the time, but could see him between 8 and 9 o'clock. Saw him several times. Couldn't say he was not off the premises."

Mrs. Carey, wife of defendant, testifies, in addition to what has been before set out, to their relations with the McKeevers; that she remembers Blake and Elliott's coming in October; that she thinks it was the 29th of October. She says she would judge it was about 10 o'clock, and tells about her husband's peeling poles, about the early dinner, and bringing the calf in. She is sure of the date, October 29th, because it was the first day after the sale, and the date the cement blocks were hauled for Kirk. The

highway between her house and McKeever's was open; no part of it out of sight, except, perhaps, a little, the size of the court room. She says she saw men go to McKeever's home in October, 1915, when Mr. McKeever was absent, one of them the Congregational preacher; but, on cross-examination, says some of the same parties came to her house. She says she didn't tell about what Miss McKeever said about her brother on the former trial; says her hus-band came to the house for a drink probably about half past 9 o'clock.

"I didn't examine the time; was doing my housework that morning." She says there was a grove straight east of the house; that there are no obstructions between Mc-Keever's and her place; that there are trees along the road; that McKeever's is on the west side of the road; that they have some trees in front, but the house is in plain sight; that she does not think Mr. Carey was off the place that morning; that she is positive of it; that she didn't see him every minute.

We have set out the testimony somewhat fully, and have given the circumstances of it, because of the claim that the evidence was not sufficient, and for the further reason that it seemed necessary on some points in the case. Some of the witnesses appear to have had some feeling in the matter, particularly Mrs. Carey. It is almost unbelievable that a woman would tell another that she had had sexual intercourse with other men, and with her own brother, unless it should be a very loose woman. There is no particular attack on the character of the complainant, except by Mrs. Carey, and the circumstances of the trans-action about which relator complains. It may be that, if Mrs. Carey told her husband the things she says she did, and he was so disposed, he may have thought he could readily have intercourse with relator. It will be noted

2. BASTARDS: proof of intercourse.

that there is but little, if any, dispute as to the day in the month, and that, if the intercourse took place, as complainant claims, it was on October 29, 1915. There is, however, discrepancy in the testimony as to the time of day that certain things testified to occurred. For instance, the defendant testifies that, after he got back from attending to the calf, he went to the house and got a drink, and went out and began peeling poles, at about 8 o'clock; while his wife testifies that he came to the house for a drink at about 9:30 o'clock, a discrepancy of an hour and a half. Some of the witnesses guess at the time. None of them attempts to fix the hour accurately. We have held, in criminal cases for seduction, that the intercourse may be established by the testimony of the prosecuting witness alone, if the jury believe her, even though denied by the defendant. It would be difficult, and next to impossible, to prove sexual offenses in any other way. Though defendant denies the intercourse, it was a question for the jury to determine.

Under the evidence, the jury was justified in finding that intercourse had taken place, as plaintiff claimed, and we think they were justified in finding that it occurred on October 29th. There is no pretense or claim that it occurred on any other date. The more important question, as we view it, is whether the jury was justified in finding that defendant had time to go a quarter of a mile, either on foot or horseback, and be in relator's house 25 minutes. We think the jury was justified in finding that defendant had not covered the time so closely during the forenoon as that he would not have time to do so. A variance of a quarter of an hour or a half hour earlier or later, either way, or both, as to the whereabouts and doings of defendant, during the forenoon, would give him time. The credibility of the witnesses on the disputed point as to the time of day was for the jury. The jury could have found that the defendant did pass claimant's house on the morning

of the 29th, and go to Hannah's. The fact that disinterested witnesses contradict defendant as to this affects his credibility. Hannah testifies that he was at his house but a short time. There was no particular reason for defendant's wife and Miss Thompson to watch defendant all the forenoon. They were engaged about their household duties.

2. The defendant requested an instruction to this effect:

"You are instructed that the defendant is presumed to be innocent until it has been shown by a preponderance of the testimony that he is guilty. Before the defendant can be found guilty, the plaintiff must show by a preponderance of the evidence that he is the father of her child, which is in question in this case."

3. BASTARDS: instructions: presumption of innocence.

Error is assigned because of the refusal of this instruction. The latter part of this instruction requested by defendant was covered by the instructions given by the court. The court instructed the jury, in substance, that the burden of proof was upon the State to establish, by a preponderance of the evidence, that defendant is the father of the child; and that, if the fact is so established by the evidence, then the jury should find the defendant guilty; and that, unless it is so shown, the finding should be for the defendant. Appellant cites at this point *State v. Wangler*, 151 Iowa 555, at 562, where an instruction given by the lower court in a bastardy case, telling the jury that defendant was to be presumed innocent until the jurors were convinced, by a preponderance of the evidence, that he was guilty, was approved, in a way. But, in that case, the complaint was as to the instructions, and the court said that, because of the instruction just referred to, the defendant was not prejudiced by the refusal to give other instructions asked. They also cite *State ex rel. Bjorn v.*

*Creager,* 97 Kan. 334 (155 Pac. 29), where a similar instruction was given. Probably such an instruction would not be prejudicial to defendant. It may be that, in some instances, the force or importance of the presumption is exaggerated by counsel in argument, and perhaps by the jury. In 1 Jones' Blue Book of Evidence, Section 12 A, cases are to be found both ways, some holding that, even in a civil case, such an instruction as that asked is proper. We held, in *State v. Hayward,* 153 Iowa 265, 268, that, even in a criminal case, the failure of the court to instruct that the law presumes every man innocent until he is proven guilty, was not error. In that case, the court instructed that every material element of the crime charged must be proven beyond a reasonable doubt; and this in itself presupposes the innocence of the accused. In addition to this, jurors of ordinary intelligence understand that, in law, every man is presumed to be innocent until proven guilty beyond a reasonable doubt. It is true that, in that case, such an instruction was not asked. In the instant case, there was but one element or question,—the paternity of the child; and the jury were plainly told that, before they could find the defendant guilty, they must be satisfied, by a preponderance of the evidence, of his guilt. The instructions given are equivalent to this requested one, as was the case in the *Hayward* case. There are many instances where there is a presumption of right conduct. The books say that, in the ordinary transactions of life, fairness and honesty will be presumed, and conveyances, sales, and contracts generally are presumed to have been made in good faith, until the contrary appears. A public officer is presumed to do his duty. There are many such cases; and though, in some cases, it may be proper enough to give such an instruction, yet we are not cited to, nor do we find, cases where a failure to so instruct the jury would be error. Perhaps, in some of the cases just referred to, it

would not be error to give an instruction of that kind;
but the question is whether it is necessary to do that, and
whether its refusal is reversible error. It seems to us
that there would be more reason for giving such an in-
struction in a criminal than in a civil case. 16 Cyc. 1081.
But we have shown that the court has said that, in a crimin-
al case, it is not always necessary. It appears to us that the
sum of it is that the jury should be told that the defendant
must be proven guilty in a criminal case beyond a reason-
able doubt, and in a civil case by a preponderance of the
evidence. The presumption obtains all the time, whether
a party is on trial or not, in every action, civil or criminal.
1 Jones' Blue Book of Evidence, Section 12 A and Section 13.
We see no reason why such an instruction is required in a
civil case, unless the presumption has the force of evidence.
The presumption in question is not of that character, even
in a criminal case. *State v. Linhoff*, 121 Iowa 632. We
think there was no error in refusing the instruction in
question.

3. The defendant's requested Instruction No. 2 was
refused, and error is assigned because thereof. The in-
struction is a long one, covering two pages of the abstract,
and too long to set out in full. It recites
a number of circumstances proper for
the jury to consider. We think it is not
necessary to give the language, but so much
only as bears upon the question which appellant now relies
on, and argues as an offered instruction on alibi. Some
of the matters referred to in it were covered by the in-
structions given; some of the statements are more or less
argumentative. The part now relied upon as being a re-
quest for an instruction on alibi is simply one of numerous
circumstances enumerated, and is to the effect that it would
be proper for the jury to consider where defendant was,
and whether he was at plaintiff's house. As to this feature,

4. BASTARDS:
instructions
*in re* alibi.

we shall give the instruction as asked, or the substance of it. The material part of the instruction in regard to the question now under consideration is practically as follows:

"The jury is instructed that, ordinarily, the exact time when the child in question was begotten, in proceedings of this character, is immaterial, so long as it is within the period of gestation. The testimony of Lila McKeever refers to but one time when it is claimed by her that she had sexual intercourse with this defendant, and that was on the 29th day of October, 1915, at the home of her brother. Lila McKeever claims in her testimony that at no other time or place did she ever have sexual intercourse with the defendant. The defendant denies that he had sexual intercourse with the plaintiff at that time, or any other time. In determining whether the defendant is the father of Lila McKeever's child, * * * you should consider no other time or place save and except in the home of her brother, on the 29th day of October, 1915; as there is no evidence on either side that the said Lila McKeever ever had sexual intercourse with him, unless it occurred on the 29th day of October, 1915, at the home of the brother of the said Lila McKeever. You should consider, in determin-- ing what the truth is about the matter of associations, his treatment of her before and after October 29th, as throwing light on whether defendant had sexual intercourse with her at that time and place, and where the defendant was on that day, whether at relator's home or elsewhere; and in this connection you should consider the interest, if any, of the witnesses * * * and from all the testimony determine whether or not defendant did have sexual intercourse with plaintiff on that date," etc.

So that the reference in this instruction to his whereabouts is one of numerous circumstances referred to in the instruction. The court is not required to instruct on every phase of the testimony. We think the request for this

instruction does not amount to a request for an instruction on alibi. Counsel concede that it is not in proper form to present that question, but say that the principle was referred to, and that the court, therefore, should have given one on that subject. But several other matters were therein called to the attention of the court, just as much as the question of his whereabouts, and we think it would have been well enough for the court to have referred to some of these; but we are discussing now the question of alibi, and whether defendant did really request an instruction on alibi. Had ordinary instructions been given by the court as to alibi, defendant would be in a position to complain, and say he had not asked an instruction on alibi. The instruction offered does not mention alibi, does not state that the burden of proof is on the defendant (*State v. Fry,* 67 Iowa 475, 478), and does not advise the jury to scan the testimony introduced by defendant to establish the alibi with care and caution, as it is recognized under the law as a defense easily manufactured (*State v. Rowland,* 72 Iowa 327). It is our experience that attorneys defending generally prefer that the court should not give such an instruction, and complain if it is given. Of course, alibi is a legitimate defense, but it is known of all men that, as to the time of day, witnesses are easily mistaken. But, after all, appellant's argument is directed, not so much to the time of day, as it is to the date or day in the month. The argument is that, complainant having fixed October 29th as the date, to permit the jury to return a verdict of guilty on any other occasion, and on any other time except October 29th, would be to permit the jury to return a verdict that had no support in the evidence, and would permit the jury to find defendant guilty of acts of sexual intercourse with complainant at times when there is no evidence that defendant had intercourse with her. Appellant cites *State v. Ryan,* 78 Minn. 218 (80 N. W. 962). In that case, the complain-

ant positively fixed August 25th as the date of the inter-course, and the court instructed that, unless there is proof of acts of sexual intercourse on the 25th of August, or about that date, etc. The court held that, under the peculiar circumstances of that case, this was error, although recognizing the fact, as the offered instruction in this case does, that the precise date is not always material, provided it is within the period of gestation. In that case, the evidence showed that, on the date fixed, and for two days, she had been menstruating, and that this condition continued for about two days afterwards. The evidence showed that a woman is not likely to become pregnant under such conditions, and the evidence further showed that the parties were together on other occasions, not far from August 25th. We think the cases are readily distinguished. In the instant case, the court did not instruct as to October 29th or "about that date;" the complainant and defendant were not together on other occasions near October 29th; and other conditions existed there which are not found in the instant case.

State v. Creager, supra, is also cited, as sustaining a similar proposition. The offered instruction recites that there is no evidence on either side that Miss McKeever ever had sexual intercourse with defendant, unless it occurred on the 29th day of October, at the home of her brother. The jury knew this just as well from the evidence as if they had been again told by the instruction. We must assume that the jury has common sense, and we ought not to assume that the jury will disregard the testimony, and find that the intercourse took place at some other date, when there is absolutely no evidence that it did occur at any other time. The jury must have understood that, before they could find the defendant guilty, they must find he had intercourse with complainant at the time and on the

occasion testified to by her.   Furthermore, the court in-
structed the jury:

"5. The complainant claims that, on the 29th day
of October, 1915, the defendant came to her home in Bear
Grove Township, and there had sexual intercourse with her,
and that she became pregnant as a result of such inter-
course, and was delivered of a child on July 26, 1916, and
she claims that defendant is the father of the said child.
All of the above matters are denied by the defendant. The
burden of proof is upon the State to establish, by the
greater weight of the evidence before you, that the defendant
is the father of the said child; and, if this fact is so establish-
ed by the evidence, then you should find the defendant
guilty; but, unless it is shown that he is the father of said
child, by the greater weight of the evidence before you, then
you should find defendant not guilty."

The court further instructed the jury that they should
consider "each and every other fact and circumstance in
evidence before you tending to throw light" on the ques-
tion; "and, taking all such matters into consideration, you
should weigh the testimony of each witness, in the light
of reason and common experience," etc.   We have dis-
cussed to some extent the evidence on this point in a prior
division of the opinion.   We think there was no error in
refusing to give the instruction in question.   Evidence as
to so-called alibi in a civil case is evidentiary, and does not
apply as in a criminal case.

4. It is thought that the court erred in giving In-
struction No. 3.   The objection is that it assumes facts
essential to be established by proof, which were not ad-
mitted by defendant in his answer.   In that
instruction, the court said, in substance,
that it was conceded or established by the
evidence that complainant was an unmar-
ried person, a resident of Cass County, and that, on the

5. TRIAL:
assumption
of fact.

date stated by complainant, the child was born. It is true that the defendant did not admit these things in his answer, but the evidence was undisputed, so that the court was warranted in so stating.

5. Finally, it is contended by appellant that the judgment is excessive. The amount fixed by the court was $2,250. The judgment provided that defendant pay into court, for the use of relator in the maintenance and support of the child, said sum, with interest thereon from the date of the judgment. No cases are cited by appellant, and there is no definite rule as to the amount. Appellee cites *State v. Ginger*, 80 Iowa 574, where $700 was allowed. But that was nearly 30 years ago. They cite, also, *Ludden v. Butters*, 181 Iowa 94, as having some bearing. If any evidence was taken by the court as to the amount, it is not before us. It does not appear from the record that the amount allowed is more than sufficient to maintain the child. Probably we may take notice of conditions, in a general way, without proof. The amount does seem large; and yet living conditions are very high at this time. The amount fixed would amount to about $2.00 a week, until the plaintiff's son will probably be self-supporting. That would be low, under present conditions. But doubtless there would be some interest. Under all the circumstances, we are not prepared to say that the judgment is too large. We discover no prejudicial error in the case, and the judgment is—*Affirmed.*

6. NEW TRIAL: excessive verdict.

WEAVER, C. J., LADD, EVANS, and GAYNOR, JJ., concur.

SALINGER, J. (dissenting).    I.    Defendant did not ask for a directed verdict, and seems to concede there was enough evidence to warrant submission to a jury. But he urges that the jury exercised its proper function improperly, by returning a verdict which is contrary to and

not sufficiently sustained by the evidence, and, therefore, is the result of passion and prejudice. There is reason to believe the majority is holding that such a complaint cannot be entertained, unless the insufficiency of the evidence amounts to such absence of evidence as warrants a directed verdict. This is a misconception. It is settled that, though the right to claim a directed verdict does not exist, or has been lost, yet the right remains to insist, on motion for new trial, that the evidence does not sustain the verdict. *Heiman v. Felder,* 178 Iowa 740, 748; *Hanson v. Hough,* 177 Iowa 93, at 101. Indeed, if the rule were otherwise, some statutes would have no room to operate. The legislature, well knowing that no motion for new trial was needed to test the propriety of overruling a motion to direct verdict, yet enacted statutes demanding motion for new trial, in order to challenge the sufficiency of the evidence to sustain the verdict returned, and it provided an appeal, where such a motion was overruled. This must mean 'that, though there was enough evidence to warrant a submission, there might be appellate review on whether, though there was not literally an absence of evidence, it was, nevertheless, so weak and contradictory as to indicate that the verdict rests on an unsound basis—on an improper weighing of evidence. · The defendant may, in anticipation that the evidence will be fairly dealt with, say, in effect, that there is enough evidence to send the case to the jury, and yet complain when the event shows it was not so dealt with. If it transpire that the verdict rests on nothing but evasive, unreasonable, and unnatural testimony of the party having the burden, the appellate court should interfere though it may not be said there is a literal absence of evidence. Such unnatural testimony is not aided because the defendant denies, and his denial does not make the "conflict" which prevents our interference. And this case should be ruled by decisions such as *Chicago Cottage Organ*

*Co. v. Caldwell,* 94 Iowa 584; *Eastman v. Miller,* 113 Iowa
404; and *Williams v. Budgett,* 186 Iowa 196.  In the last-
named case, there was no motion for a directed verdict.
The sole complaint was that the verdict should not stand,
because it rested on the testimony of the plaintiff in what
was a suit for debauchment, and that her testimony was
unnatural and self-contradicting.  The appellee argued
against the claim that the plaintiff had told "a discon-
nected and self-contradictory story," by saying that her
testimony "was sufficiently well connected and uncontra-
dicted as to convince twelve fair-minded and unprejudiced
men that she was telling the truth in the matter, which
shows conclusively that the verdict was supported by suffi-
cient evidence to warrant the finding."  We said that this
amounted to an assertion "that, when a complaint is made
on appeal that the evidence is of such a nature as that the
verdict is unwarranted, a sufficient answer to such an attack
upon the verdict is made by the fact that the verdict was
rendered; that this position quite eliminates all appellate
consideration of the assignment that a verdict lacks suffi-
cient support;" that, under it, "the existence of the verdict
would preclude inquiry into whether it should exist, and
that appellee, in effect, urges that appellate review of a
verdict must be the declaration that whatever is is right:"
and we concluded by saying that we thought, on the au-
thority of *Miller v. Paulson,* 185 Iowa 218, that review
should go beyond that.

　　As it seems to me, then, the thing to be decided here
is not whether the relator had no evidence, but whether her
testimony is so unnatural, contradictory, and unreasonable
as that the jury acted from passion and prejudice in finding
for her.

　　II.  Relator and her brother stayed at the home of
defendant for parts of four weeks.  At this time, Mrs. Carey
was not at home, except over Sunday.  Relator stayed

nights, and, while she says she does not know, she concedes that she and defendant may have been on the place alone. To a certainty, the two were once alone in an attic. If she be believed, during all these times, defendant acted like a father, and there was not as much as an improper suggestion. If she be believed, defendant, not an impulsive youth, but a man who had accumulated substantial property, and was 60 years old, made no use whatever of all these opportunities, and, instead, selected broad daylight, and a time when his absence from home would be noticed, to go, without prearrangement, to the house of relator. Her house was in plain view from his home. It stood on the higher ground, and men who entered it could be identified by persons in the home of defendant. According to her story, defendant entered a room the door of which was open, and into which room anyone could look. She says that, at all times theretofore, he had never acted abnormally, treated her with every respect, had been more like a father to her than anything else; that she had thought of him more as a father than anything else; had never thought him anything else than Mrs. Carey's husband; and that she had never done anything to encourage him to offend her. After having wasted better opportunities, and refrained from much more natural approach, it is remarkable how, under these conditions, defendant had the temerity to select such a time and place as he did, and to assume what the event proved to be a correct assumption: to wit, that she would submit without word or struggle. It would seem that no one but a maniac would have taken the risks he did, if relator correctly states the antecedent history of the relations. It is even more unnatural and remarkable that, with such past relations, a woman 36 years old, and asserting virginity and devout adherence to church, should have failed to utter even a single word of astonishment or protest, while defendant, without a word, entered upon and

accomplished his purpose with the utmost promptness. I am not overlooking that neither chastity nor resistance are essential here. I am merely pointing out that such an unreasonable and unnatural story works an impeachment of any who utters it. It is not overlooked relator testifies that defendant said, "Bill, don't fight me so." Unfortunately, she testifies fully to everything that occurred, and nothing is indicated from which defendant could infer that he was being fought, or that should induce him to ask that the fighting cease. This, like her evasiveness, goes to credibility. But, after all, it is the credibility of the interested complainant, who speaks without corroboration. As to her, credibility is somewhat less for a jury than is that of an ordinary witness. And there is involved the rule that, while one is not defeated because his witnesses differ, he is defeated if admissions made by him as a witness contradict what he says in his own favor.

### 2-a

And relator is evasive, and strongly indicates animus. She says that, while she was not actually ordered off the place, the pleasant social relations theretofore existing with the Careys came to an end, a few months before the alleged conduct of defendant; that she realized Mrs. Carey didn't want her; that the custom of calling her later to help wash ended; that exchange of work between defendant and the brother of relator ended. She says Mrs. Carey never told her why this all occurred. It is, however, undisputed that Mrs. Carey did tell her not to come back any more, and it was drawn from relator that she well understood what the trouble between her and Mrs. Carey was. One trouble was an accusation by Mrs. Carey that relator was coming to the place to see "their men," not including her husband. Relator finally says that it was about from this time on that the friendly relations began to wane. Later, she added that, after she had told Mrs.

Carey- that this accusation was a lie, the latter was just as good to her as she had been before; and she persists that she does not know why she was not called to help wash afterwards, and in saying that "why she did this, I never knew her reason for it." Perhaps she might have guessed at the reason, in the light of her further testimony that there was difficulty between her and Mrs. Carey, because the latter accused her and the defendant of having gone up into the attic.

### 2-b

There are other things that add to the unreasonableness of it all. She was a virgin, 36 years old, and defendant a man of 60. There was but the single act; yet pregnancy resulted. Defendant made no request that relator keep silent. But she said nothing, when her brother came home. The act occurred on October 29th. She discovered her condition about two weeks later. She made no complaint until about four months later. She then advised defendant, and coupled it with an inquiry, "Mr. Carey, do you think there is anyone else?" She did not inform her brother for two months after she had spoken to defendant.

### 2-c

Relator was not obliged to claim that no other man could be the father of her child, and it may be conceded that it is almost impossible to prove such an alibi. But, since she chose to testify that she was exposed to no other man, it is permissible to consider that she says she rode in an automobile with a man "in the fall of 1915." Also that, when she advised defendant of her condition, she said, "Mr. Carey, do you think there is anyone else?" All this leaves matters as they were. There is no corroboration by a showing that it was impossible for another to be guilty. The attempt thus to corroborate relator consists of her uncorroborated and disproven exclusion of others. It still

remains true that nothing but the word of relator singles
out the defendant.

2-d

*Williams v. Budgett,* 186 Iowa 196, affords full support
for setting this verdict aside.  So does *State v. Wangler,* 151
Iowa 555, 563.  It is true it holds that the evidence in it
was not so absurd, self-contradictory, and did not relate
matters so physically impossible, as to enable the court.
to set the verdict aside for those reasons.  But an ex-
amination of what is stressed in that case, including the
corroboration of the complainant, makes plain that the
sufficiency of the evidence can be reviewed on appeal, and
that the verdict would have been set aside, had there been
such a state of the evidence as is disclosed in this record.

There are but two methods by which an affirmance
can be effected.  The judge may force himself to believe,
as a judge, what his reasoning as a man scouts.  I regret
to say that two members of the court seem to have done
that in the *Wangler* case.  If it is a fair question whether
the evidence is incredible, the appellate judge should yield
to the jury.  And that is so even if his finding, were he
a juror, would not be what the jury found.  But I know of
no obligation to sustain a verdict when I am abidingly
satisfied (as I am here) that it has no support that I am
able to credit.  If, in order to uphold a verdict, the court
must sustain a finding that white is black, there is no oc-
casion to retain the statutes which permit review of a
verdict.  The remaining method of sustaining this verdict
is to indulge in the inherent self-contradiction of believing
appellee because one does not believe her.  In other words,
the only way of enabling one to believe that relator ought
to have a verdict is by believing that, if she had told the
truth, instead of not telling it, her story would have been
a more reasonable one.  If she had said there had been fre-
quent solicitation and indulgence, the story told as to

what happened on the day in question might become credible. Many changes that could be suggested would have the same effect. But it is a remarkable twist in judicial reasoning that one may keep a verdict because he has not spoken the truth. In *State v. Ryan*, 78 Minn. 218 (80 N. W. 962), a bastardy prosecution, the court, in setting aside the verdict, said:

"If her statement as to the occurrence was disbelieved and rejected by the jury, there was an entire absence of evidence to support the verdict."

That is what should be said here. If a more credible story could truthfully have been told, and the incredible one is not truthful, there is no room for supporting the verdict on what it is imagined the truth would be. The only permissible result of finding that the complainant testified falsely is to eliminate her testimony; and it is uncorroborated. Its incredibility should not be made the means of supporting her recovery, by imagining a credible story for her. The belief that she has testified to what is untrue, because improbable and unreasonable, should have no effect, except to expunge her testimony.

III. Defendant attempted to show that he was at home at the time when relator charges him with having been at her house. His witnesses on that point include Miss Thompson and Blake, then the postmaster of Atlantic, both unimpeached, and absolutely disinterested. Indeed, the majority does not raise the issue of credibility in this connection. It avoids this line of testimony with the statement that if, through honest mistake, the witnesses on both sides erred by as little as a quarter or a half hour, earlier or later, the testimony on the so-called alibi would be ineffective. It is one weakness of this class of testimony that honest witnesses may put the right picture into a wrong frame; that they may truthfully testify as to the doings and whereabouts of a defendant, but, through mis-

take, be speaking of a date other than the one in inquiry. That weakness is eliminated here. The alleged act occurred on the day which succeeded the McFarland sale, and on which Kirk employed the brother of relator, and also the son of defendant, to haul tile to Atlantic. The day was the only day on which Blake and Elliott were ever on defendant's farm together. So there is no question that whatever is spoken to did occur on the day designated by relator in her complaint. Nor is it possible to dispose of this issue by the statement that an honest misjudgment of time, by so much as a quarter or half of an hour, destroys this defense. It cannot be disregarded, without a holding that the wife of defendant and Miss Thompson, the latter wholly disinterested, committed perjury. These witnesses unite in saying that, during the whole forenoon, defendant was peeling poles, in unobstructed view of the house, where he was in plain sight from the house in which these witnesses were. True, they did not say that they had their eyes on him all of the time. But they do say that they did not miss him on that forenoon. The majority concludes that this testimony is of no value, because "there was no particular reason for defendant's wife and Miss Thompson to watch defendant all forenoon. They were engaged about their household duties." All that is true. But it does not change testimony that this man was at work in plain sight; that he was observed, from time to time; that Miss Thompson saw him, as he went back and forth; and that he was not missed, all of that forenoon. Mistake will not suffice here. This testimony is either true or willfully false. It is not a question of a quarter or half an hour. True, the majority speeds the incident up by assuming that defendant may have traveled on horseback. The testimony of relator is that he came on foot, and went away towards his home by a roundabout route. It is utterly impossible that he can have left his home on foot, remained in the house of relator

25 or 30 minutes, that she says were used up, and have returned home without having been away from home at least a full hour. So the majority finally concludes that these two women, who saw defendant at work, peeling poles, were so engrossed in their housework that they are honestly mistaken, when they testify that they did not miss him during all the forenoon; that he could not have been away for an hour or more without their knowledge. I cannot avoid believing that, unless both these women are perjured, defendant was not away long enough to do that with which he is charged.

### 3-a

On the question of what time in the day it was when Blake and Elliott came upon defendant's farm, there is more room for the attitude of the majority than there is as to the testimony that defendant was not missed at all during that forenoon. On this point, I would agree with the majority, if the relator, on one hand, and the witnesses for the defense, on the other, merely undertook, at the time of the trial, to say, without more, that certain things occurred at a particular hour of the day. But none of them confine themselves to such an arbitrary statement. They all narrate circumstances that, of themselves, tend to show time. And, allowing for all reasonable variances, I still think it plain that, if the relator is to be believed, Blake and Elliott saw defendant at his home at just about the time when relator declares he first entered her home. I will not enlarge beyond this statement at this time, because the details must be gone into in another connection.

IV. Now, as to the instructions: The relator begins, with the statement that her brother left home that morning around 8 o'clock. She had her housework done, and sat down to her sewing machine about half past 9. It is her opinion that, when defendant came in, she had been at the machine about half or three quarters of an hour.

Upon these antecedent things, she gives it as her best judg-
ment that defendant came in at a quarter past 10. She
says he remained from 25 to 30 minutes, and it may fairly
be said he had occasion to be present at least that long. He
walked away through a field, not in the direct route to
his home. Relator says that this was about a quarter to
11. To be sure, she has such qualifying words as that she
imagines that, when he arrived, it was somewhere between
10 and half past 10; that she can't say exactly, but thinks
he left at about a quarter to 11,—at any rate, between
half past 10 and 11 somewhere. On the other side, we have
the time at which defendant's son started to Atlantic to
haul tile, the speed at which he drove, and the distance out
at which he met Blake and Elliott. We have the means of
locomotion used by Blake and Elliott, and the distance
between the meeting place in the road and the home of
defendant. Blake and Elliott and Miss Thompson and de-
fendant and his wife all unite in saying that Blake and
Elliott arrived around 10, a very few minutes thereafter;
that positively it was not as late as 10:30; and, when they
arrived, they found defendant peeling poles. We have tes-
timony that they remained some 2 hours; that an early
dinner was ordered for them; and that they left a few
minutes after 12. The direct testimony, based on the cir-
cumstantial evidence, makes it fairly plain that, though
relator does not fix time exactly, defendant could not, on
her evidence, have left in time to be home before 11 o'clock.
And it is as plain that by no possibility did Blake and
Elliott arrive later than 10:30.

A refused offered instruction asked the court to charge,
among other things, that, upon whether the act occurred at
the time charged, the jury should, so far as it was shown by
the evidence, take into consideration "where the defendant
was on that day; whether he was in the home of the brother
of relator, on the morning of October 29, 1915, or whether

he was elsewhere." There was the aforesaid evidence bearing on that question. Grant that this testimony may rest on an honest mistake, and that, therefore, it is not so strong as to warrant interference with the verdict. Grant that the jury might rightly have found the witnesses were mistaken, and that an alibi had not been established. But who will contend that the evidence I have set out was such as to compel the jury to disregard it? And yet the refusal of the instruction was, in effect, a ruling that the jury had no right to find, on this evidence, that plaintiff was not at the house of relator at the time she claims he was. How does the majority defend this refusal? The opinion concedes it would have been well enough to have made reference in the charge to some of the circumstances covered by the offered instruction, and adds that the request as to how the whereabouts of the defendant should be dealt with was but one of several circumstances referred to in the offered instruction, and the court was not required to instruct on every phase of the testimony. In the absence of an offer, failure to instruct may ordinarily not be complained of. It does not matter what is not charged upon, so long as the instruction given does not err in what is said. But the very office of an offered instruction is to improve upon an abstractly correct instruction given, by making it more full and more pointed. Therefore, the abstract fact that the court is not bound to refer to all that the evidence discloses is no answer to a failure to present a theory distinctly disclosed by the evidence upon which an instruction is asked.

The next avoidance argument is that the instruction did not use the word "alibi;" that the offer included no statement that defendant had the burden, and did not have the usual cautionary instruction, given where alibi is submitted; and that it is the experience of the majority that attorneys, as a rule, prefer that an alibi instruction, carry-

ing, as it does, the usual disparagement, should not be given. The attorneys in this case evidently did not prefer that such an instruction should not be given; for they asked it. It follows they could not have complained if it had been given. True, the offer did not say anything as to burden of proof, nor in disparagement of the defense of alibi. But, if it be assumed, for present purposes, that the issue of alibi, in strictness, was tendered, still the request that said testimony be considered was a proper one, and it was open to the court to safeguard the giving of it by adding the rule as to the burden of proof, and the usual disparagement of the defense. It was, at worst, a case for giving, with proper modification.

The final avoidance is that the field of the offer was sufficiently covered because the court did instruct the jury to consider each and every fact and circumstance in evidence which tended to throw light on the ultimate question, and that, after taking all such matters into consideration, it should weigh the testimony of each of the witnesses, in the light of reason and common experience. If that suffice when a definite instruction is asked, all law on appellate review of instructions is put into utter confusion. Following it to its logical end, the holding of the majority comes to this: Appellant may not complain of an instruction given, merely because it is not full enough or not specific and clear enough, unless he has attempted to get a more complete and clearer instruction by means of an offer. But if he does make such offer, he can have no review, because the instruction given is correct as far as it goes. If he makes no offer, he may not complain that the charge, though abstractly correct, is not sufficiently specific. If he does make the offer, he cannot complain of its refusal, because the instruction, in a general way, and in a general way only, covers what he has asked to be made more specific. Paucity and generality may not be complained of, in the

absence of an offer. If the appellant does not ask that the broad charge be made definite, certain, and easily applied, he can have no relief on appeal. But if he does offer an instruction because there is that objectionable generality, he will be denied relief, because such general instruction *was* given. I am unable to find any theory upon which the trial court was justified in refusing to let the jury pass upon the weight of the aforesaid testimony.

V. A related question arises on the same refusal to instruct. The offered instruction did not ask a submission of alibi, in its usual sense. It was not the theory of defendant that his evidence, if believed, demonstrated that he never was where he might have had intercourse with relator. This is perhaps another reason why it is not material that the offer omitted burden of proof and disparagement. The theory which he desired submitted was that, no matter what else it found, the jury could not convict, unless it found paternity was created by commerce had on October 29, 1915. He asked consideration of said testimony, not on whether he was the father, but on whether the child was begotten on that very day. In effect, he presented that, if the jury refused to believe the testimony of relator that the act occurred on that day, no evidence of guilt was left, and he desired that said testimony should be considered, in determining whether the act did or did not take place on October 29th. According to *State v. Ryan,* 78 Minn. 218 (80 N. W. 962), this is a sound theory. In setting aside a conviction in a bastardy case, the court said:

"If her statement as to the occurrence was disbelieved and rejected by the jury, there was an entire absence of evidence to support the verdict."

If defendant was entitled to such a limitation on the field of inquiry, the instructions given do not have a hint of it. They advise the jury that the complaint charges the

act occurred on October 29, 1915, and further charges that
a child was born after the period of gestation. Then follows
a statement that the defendant denies connection on that
date, or any other. The jury is next told that the only
question for its determination from the evidence is "whether
the defendant is the father of the child." The court con-
tinues that the State has the burden to establish that the
defendant is the father of the child, and, if that fact is
shown by a preponderance, he must be found guilty. The
range of the inquiry is once more limited by the eighth
instruction, which tells the jury that the only thing it is
called upon to determine "is whether or not the defendant
is the father of this child;" and, that being found from the
evidence, there is an end, because all orders as to proper
support are for the court. The child was born on July 26,
1916. Of course, the jury could, in reason, find that it may
have been begotten two or three days before October 29,
1915, or two or three days after that date. The court not
only failed to instruct that a conviction could rest upon
nothing except a begetting on October 29th, but charged
expressly that paternity was the only question, and thereby,
by the clearest implication, that the fatherhood was all, and
the time of begetting nonessential. The complaint and
the evidence in support of it made October 29th vital. Yet
the court, in the face of a request to limit the inquiry to
that date, sanctioned it to be made without reference to
that date. In *State v. Ryan,* 78 Minn. 218 (80 N. W. 962),
the defendant offered a similar instruction. It was not re-
fused. All that was done was to modify it, by qualifying
the date fixed in the offer with the words "on or about."
There, as here, the complaint and the evidence settled upon
the one day fixed in the offered instruction. The verdict
was set aside. The court, in so doing, expressly recognized
that, ordinarily, it suffices that connection within the period
of gestation be shown. But it differentiates cases like the

one before us, because to permit such range in them would be to permit a verdict unsupported by either plea or proof.

The justification by the majority is, in effect, that no date except October 29th is as much as referred to in either the complaint or in the evidence; that there was no pretense or claim that the connection took place on any other date; and that, since one must attribute the possession of some common sense to jurors, the jury knew, without any instruction, that it could not find the defendant guilty unless it found the act occurred on said date. Of course, if the fact that jurors are credited with common sense sustains the argument founded upon that assumption, there is really little need to have a jury instructed at all. It is never impossible that jurors will arrive at the right conclusion to be drawn from the plea and proof. But yet it is customary to instruct them, nevertheless, and, indeed, the statute seems to contemplate that there must be instructions. If there had been literally no instruction on the subject, the verdict would be in better case. But there was not only a failure to tell the jury that it must limit its consideration to one day, but there were statements from which any reasonable mind could infer that, if it found defendant was the father, that was sufficient, even though he failed to believe that the connection was had on October 29th. Therefore, I find it difficult to agree with the statement of the majority that "the jury must have understood that, before they could find guilt, they must find he had intercourse with complainant at the time and on the occasion testified to by her." This very argument or assertion is fully discussed in the *Ryan* case, supra. There, as said, the trial court did give the instruction offered, but modified it by prefixing to the time stated in the offered instruction the words "on or about." It thus left the jury at liberty to find whether the act occurred on or about the time fixed, and the court said:

"It is true that the inquiry in this class of cases is as to the paternity of the child, and not as to the exact day on which it was generated; but it is essential to allege a date in the complaint, and to substantiate the allegation at the trial. The exact day on which the child was begotten is immaterial, except as it bears upon the principal question, which is, whether or not the accused is the father of the bastard. And the court below could have safely charged the jury in this action that, while the exact date of the intercourse between these parties was not material, the occasion was, because of the peculiar circumstances testified to by the complainant. But this is not what the court charged, nor was the charge equivalent to this. It gave the jury an opportunity wholly to reject the testimony of the plaintiff as to what transpired on the evening of August 25th, and at the same time to conclude that the child was begotten on some other occasion, about that day. * * * Under the charge as given, including the modification of the requests of counsel, the jury might have been misled on the subject of dates, and have felt justified in disbelieving the complainant's account of the time, place, and circumstances under which she became pregnant."

The court continues that, since there was great inherent improbability if the act occurred as the complainant stated, that very improbability, instead of resulting in discrediting her testimony entirely, and leaving the State without any evidence, may well have resulted, under the breadth of the instructions, in a conclusion that, since the act was improbable under the circumstances narrated and the time fixed, and since the birth occurred within the period of gestation, starting with a day or two before or a day or two after the time narrated, that, while it did not occur at the time and place testified to, that yet defendant was guilty. The court concludes with the statement that "the peculiar circumstances of the case were such that the charge

VOL. 188 IA.—85

should not have been subject to misconstruction," and therefore reverses.

Nothing I am able to add would strengthen the foregoing pronouncement. Both on reason and authority, the rule adopted by the district court was too broad, and was, under the conditions of the record, misleading. It seems to me to be manifest, therefore, that, even if it could be said the charge given was not affirmatively erroneous, it was clear error to refuse the limitations upon it which the defendant offered.